660 A.2d 986

**Jerry S. TYLER**

v.

**STATE of Maryland.**

**No. 862 Sept. Term, 1994.**

Court of Special Appeals of Maryland.

*June 30, 1995.*

496

George E. Burns, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before WILNER, C.J., and MOYLAN, BISHOP, ALPERT, BLOOM, WENNER, FISCHER, CATHELL, DAVIS, HARRELL, MURPHY, HOLLANDER and SALMON, JJ.

MOYLAN, Judge.

The critical issue on this appeal involves us in what *Nance v. State,* 331 Md. 549, 552, 629 A.2d 633 (1993), referred to as

"the classic evidentiary problem of the turncoat witness." The appellant is Jerry S. Tyler, who was convicted by a Prince George's County jury, presided over by Judge Arthur M. Ahalt, of murder in the first degree and other related offenses. The turncoat witness was Gerald Eiland, the erstwhile codefendant with Tyler for the same murder.

On this appeal, Tyler has raised eight contentions:

1) that Judge Ahalt erroneously admitted the prior testimony of Eiland given at Eiland's earlier trial;

2) that Judge Ahalt erroneously granted an eighteen-day continuance in an effort to compel Eiland to testify;

3) that the evidence was not legally sufficient to sustain the convictions;

4) that Judge Ahalt erroneously instructed the jury that the appellant could be convicted as an aider and abetter;

5) that Judge Ahalt committed plain error in instructing the jury on first-degree murder;

6) that Judge Ahalt committed plain error in not instructing the jury that its verdict must be unanimous;

7) that Judge Ahalt erroneously admitted irrelevant and prejudicial testimony from the witness Michael McCutchen; and

8) that Judge Ahalt erroneously excluded testimony from the appellant's mother.

### The Factual Background

On the afternoon of December 4, 1990, in what turned out to be a highly publicized murder case, James "Jay" S. Bias, III, the younger brother of former University of Maryland basketball star Len Bias, was senselessly gunned down in cold blood as he was leaving the Prince George's Plaza Mall. In *Eiland and Tyler v. State*, 92 Md.App. 56, 64–66, 607 A.2d 42 (1992), *rev'd on other grounds, Tyler and Eiland v. State*, 330 Md. 261, 623 A.2d 648 (1993), this Court recited fully the evidence leading up to the shooting of Jay Bias:

Jay Bias worked at the Hyattsville Branch of the Sovran Bank. On the afternoon of December 4, 1990, two of his coworkers, Andre Campbell and Tydus Mathis, decided to drive to the nearby Prince George's Plaza Mall during their lunch hour. Hearing their plans, Bias asked to accompany them. He had recently purchased from Kay Jewelers, located in the mall, a ring, which was being sized for him and which he wanted to show to his coworkers. The three drove to the mall in Mathis's car. While Mathis went off to browse in another part of the mall, Bias and Campbell went to Kay Jewelers, where they were waited on by Shaunelle Tyler, an employee of the store and the wife of the appellant Jerry Tyler. Bias spoke to Shaunelle Tyler about the ring and showed it to Campbell.

At approximately the same time ... Jerry Tyler and Gerald Eiland, arrived at the mall in a green Mercedes Benz, owned by Tyler's father but driven by Eiland. The two of them headed directly for Kay Jewelers. As Bias and Campbell were leaving the jewelers, Jerry Tyler entered. He apparently believed that his wife had been flirting with Jay Bias. A turbulent argument ensued between Tyler and his wife, culminating in Tyler's hurling a stapler at her. The manager of Kay Jewelers thought it prudent to end the dispute by escorting Tyler out of the store.

Bias and Campbell, now rejoined by Tydus Mathis, were standing just outside when Tyler was escorted to the exit. Visibly agitated, Tyler turned to Bias and said, "You can have her." Bias replied "that he didn't want [Tyler's] girl" and that "he was just buying a ring." Tyler, his agitation persisting, challenged Bias to "[c]ome on outside, we can take care of this outside." Bias initially started toward Tyler but was stopped by Mathis. During the entire verbal encounter ... Eiland was standing just two to three steps away from Tyler.

Heeding Mathis's advice of restraint, Bias, with Campbell and Mathis, walked toward the mall exit leading to the rear parking lot. [Eiland and Tyler] were making their way toward another exit, leading to the front parking lot, when

[one of the two] again yelled to Bias to "step outside," adding, "I've got something for you outside; I'll cap you." At that time, Eiland was still standing within two to three feet of Tyler.

As they prepared to leave the parking lot, Mathis was in the driver's seat of his car, Campbell was in the rear passenger compartment, and Bias sat in the front passenger seat. As they approached the exit leading onto Toledo Terrace, they came to a stop in a left-turn lane as they waited for two cars in front of them to make a left turn. At that point, Mathis noticed a green Mercedes "speed" toward them from the opposite side of the parking lot. As the Mercedes pulled abreast of them in the lane to their immediate right, Mathis noticed that Eiland was driving the car and that Tyler was sitting in the front passenger seat. Because the flow of traffic on Toledo terrace was heavy, Mathis was not able to proceed immediately to exit the parking lot. Indeed, when the Mercedes first pulled abreast of Mathis's Toyota, the Toyota was "stacked up" behind two other cars waiting to make a left-hand turn. The right-hand lane was free, however, and there was nothing to impede the Mercedes, driven by Eiland and occupied by Tyler, from going forward. Eiland, nonetheless, brought the Mercedes to a stop parallel with Mathis' Toyota. When, a few seconds later, the Toyota was able to "inch" forward one automobile length before stopping again, Eiland moved the Mercedes proportionately forward to maintain the parallel relationship between the two cars.

Mathis noticed that the left front window of the Mercedes was open. He saw Eiland press backward against the driver's seat as Tyler stretched across in front of him and yelled out the window. As Eiland pressed his body back against his seat, allowing Tyler to lean across in front of him, his hands were on the low arc of the steering wheel. The testimony was clear that they were not high on the steering wheel or even at midpoint but were as low as they could be without actually releasing the wheel. Campbell, who also observed this, noticed that Tyler had his right

hand placed below his knee. Tyler initially appeared "scared" but then became very angry. Because the windows of the Mathis vehicle were closed, neither Mathis nor Campbell could hear the words being yelled by Tyler. As the Mathis vehicle moved slightly forward toward the intersection, Eiland kept the Mercedes parallel with it. As Campbell was briefly turning his head away from the direction of the Mercedes, between seven and ten bullets were fired into the right side of the Mathis vehicle. Two of those bullets struck and mortally wounded Jay Bias.

The Mathis vehicle made an immediate left-hand turn onto Toledo Terrace and drove toward the Leland Memorial Hospital, where Bias was rushed to the emergency room. Shortly thereafter, Bias was pronounced dead by the hospital's attending physicians. Immediately after the shooting, Eiland drove the Mercedes away in an opposite direction from that taken by the Toyota. (Footnote omitted.)

In several regards, Andre Campbell's testimony at the trial now under review was slightly stronger than it had been in the original version. The last remark shouted at Jay Bias as the first confrontation broke up and all parties began to leave the inside of the mall for the parking lot was, "I'll cap you," meaning "I'll shoot you." Although not looking in the direction from which the shout came, Campbell testified that the voice resembled the voice of Tyler.

Campbell was also slightly more precise about Tyler's actions immediately prior to the shooting:

A Okay. At that point, you can see Tyler reaching down towards his leg on the right side, and—

Q Were you looking down into the car?

A Yes.

Q Okay?

A And, as I saw him reaching, I told him I think he had a gun.

.    .    .    .    .

THE WITNESS: Before I could get the word gun out, that's when the shooting began.

### The Procedural History

#### A.   The First Trial and Its Aftermath

Notwithstanding their motions to have their trials severed, Eiland and Tyler were tried together and were both convicted by a Prince George's County jury of murder.  Tyler was convicted of murder in the first degree and of the use of a handgun in the commission of a felony.  He was sentenced to life imprisonment for the murder and to a consecutive term of twenty years for the handgun violation.  Eiland was convicted of murder in the second degree and of the use of a handgun in the commission of a felony.  He was sentenced to a term of thirty years for the murder, ten of which were suspended, and to a consecutive term of twenty years for the handgun violation, ten of which were also suspended, for a total of thirty years to be served.

At that first trial, neither Eiland nor Tyler took the stand in his own defense.  Their separate attorneys, however, effectively asserted their respective defenses.  Tyler's attorney argued forcefully that their positions in the Mercedes, from which the shots were fired, and the position of the Mercedes *vis-a-vis* the Toyota, in which the victims were riding, made it highly probable, based on the law of physics, that Eiland, the driver closest to the Toyota, had to be the gunman and that Tyler, therefore, was a mere passive passenger.

Eiland's lawyer, on the other hand, argued equally forcefully that it was Tyler who had the motive, Tyler who was exploding with anger, Tyler who had leaned across Eiland's body to shout something out of the driver's side window, and Tyler who had been seen to reach down to retrieve something, from approximately waist or upper-leg level, just before the shooting.  Every circumstance, therefore, pointed to Tyler as the inevitable gunman.  Each defendant, through his legal surrogate, pointed his finger unequivocally at the other.

On May 26, 1992, this Court, in a published opinion, affirmed the convictions of both Eiland and Tyler. *Eiland and Tyler v. State*, 92 Md.App. 56, 607 A.2d 42 (1992). Following a grant of *certiorari* on October 8, 1992, the Court of Appeals, in a split, 4–3 decision, reversed the decision of this Court and directed that the cases against both Eiland and Tyler be remanded to Prince George's County for a new trial. *Tyler and Eiland v. State*, 330 Md. 261, 623 A.2d 648 (1993). The Court of Appeals opinion did not deal with the merits of the case but only with the issue of whether the Maryland Constitution forbade the use of peremptory challenges based on gender.

## B. The Trial Severance

Before proceeding to retrial, both Eiland and Tyler moved again to have their trials severed. Tyler moved for a trial severance on July 19, 1993. He filed on September 20 a 14-page memorandum in support of the motion for severance. Ironically, he assigned as his reasons the very reasons both defendants had assigned in their first such motion before their joint trial. That first motion for severance had been denied and both defendants strenuously argued the impropriety of that denial in the course of the first appeal to this Court.

At 92 Md.App. 72–79, 607 A.2d 42, we held expressly that the denial of the severance had not been improper. The Court of Appeals opinion did not disturb our holding with respect to the severance issue. We held that neither defendant would suffer "prejudice" as that term of art is used in severance law. The evidence admissible against one would have been equally admissible against the other. Neither defendant, moreover, would suffer the exclusion of helpful evidence by virtue of being tried with his codefendant. In looking at this primary thrust of the severance argument, we concluded, 92 Md.App. at 74, 607 A.2d 42, "[T]he appellants did not remotely qualify for a trial severance."

The appellants then attempted to establish, as an alternative rationale for severance, a "hostility between the defenses."

We observed that the law of Maryland had never recognized this notion as an independent basis for granting a trial severance. *Lipscomb v. State,* 5 Md.App. 500, 248 A.2d 491 (1968) *cert. denied,* 253 Md. 734 (1969); *Sye v. State,* 55 Md.App. 356, 468 A.2d 641 (1983) *cert. denied,* 299 Md. 427, 474 A.2d 219 (1984); *Moore v. State,* 84 Md.App. 165, 578 A.2d 304, *cert. denied,* 321 Md. 385, 582 A.2d 1256 (1990).

Finally, Tyler argued on that first appeal, as he did subsequently in his second and more successful motion for a severance, that "the jury was so confused that it returned a verdict which was inconsistent ... as between the defendants." We pointed out, 92 Md.App. at 78, 607 A.2d 42, that the allegedly inconsistent verdicts on which he premised his notion of jury confusion were, indeed, not inconsistent at all. *See Oates v. State,* 97 Md.App. 180, 627 A.2d 555 (1993).

Notwithstanding the seal of approval that we had placed on the denial of severance, Eiland and Tyler, on their second try, succeeded on October 18 in having their trials severed. The ground was thereby laid for each to point the finger at the other, not simply through the mouths of counsel but from the witness stand without fear of contradiction by the other.

No single jury, of course, would ever have permitted both defendants, one of whom at least was indisputably a murderer, to point fingers reciprocally at each other and then to walk out of the courtroom with mutual acquittals. With separate juries, however, that possibility became very real.

## C. The Retrial of Eiland

At the separate retrial of Eiland in December 1993, the possibility was realized. Eiland, without fear of contradiction by Tyler, took the stand and, under oath, laid the entire blame on Tyler. Eiland was merely the innocent companion of Tyler on the trip to the Prince George's Plaza Mall. Eiland was the passive observer of Tyler's jealous rage over the flirtatious behavior, real or imagined, of his wife, Shaunelle, with Jay Bias. Eiland was only an observer of Tyler's mounting rage as first they exited the mall and then as they prepared to

drive away from the parking lot. Eiland was shocked by Tyler's totally unanticipated behavior as Tyler pulled a gun and let loose with a fusillade of bullets.

Eiland was secure in the knowledge that Tyler would not contradict him, for Tyler, still untried, would remain mute behind his privilege against compelled self-incrimination and was not a compellable witness. Eiland's jury gave him the benefit of a complete acquittal.

### D. The Retrial of Tyler

At the separate retrial of Tyler, the possibility at least loomed that uncontradicted finger-pointing at an absent former codefendant might again succeed in creating, at least, a reasonable doubt as to the defendant's guilt.

Tyler took the stand. He described his trip to the jewelry store where he encountered Jay Bias, whom he had not known before. Bias gave Tyler "a hard stare," which Tyler promptly mirrored. Tyler remembered being "highly upset" with his wife and exchanging "a few words" with Bias, but he could not remember the exact words spoken. Tyler further testified that when the Mercedes, in which he was the passenger, came to a stop next to the Toyota, carrying Bias, Mathis, and Campbell, "hard looks" were again exchanged and that he, Tyler, indeed, said something to the occupants of the other car. He testified that during this exchange of "hard looks" and while making a comment or two to the occupants of the Toyota, he was not paying attention to Eiland.

The critical testimony was that he was then totally surprised when he heard shots being fired and realized that Eiland had fired at the occupants of the other vehicle.

That testimonial gambit by Tyler was not a precise replicate of the one earlier performed by Eiland. Eiland had been relatively secure from contradiction by Tyler, for Tyler would have been recklessly imprudent to have jeopardized his privilege against compelled self-incrimination by testifying against Eiland. By virtue of Eiland's trial having gone first, however,

and having resulted, moreover, in an acquittal, Tyler had no apparent shield against contradiction by Eiland.

The two surviving occupants of the Toyota had been unable to say with certainty whether it was Eiland or Tyler who actually pulled the trigger. Their testimony, however, was absolutely certain that it had been one of the two. There was, of course, circumstantial evidence as to which of the two had the motive, displayed the anger, and was actively involved in the confrontation just seconds before the shooting. As to which of the two actually pulled the trigger, however, only Eiland and Tyler could say with certainty.

The question became whether Eiland would say with certainty at Tyler's trial what Eiland had earlier said with certainty at his own trial. There was no reason for the State to fear that he would not. His trial testimony had been under oath. Nothing in that testimony, moreover, was in any way inconsistent with anything he ever said about the crime before his retrial or with anything he ever said about it after his retrial. The only apparent obstacle to be overcome was the privilege against compelled self-incrimination.

### *Eiland's Testimonial Performance*

To say the least, Eiland's testimonial performance was a "bust." Eiland is a resident of the District of Columbia. Accordingly, a subpoena to appear in Prince George's County as a witness was obtained and served on him pursuant to the provisions of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. Md.Code Ann., Cts. & Jud.Proc. § 9–303; *State v. Breeden,* 333 Md. 212, 222–28, 634 A.2d 464 (1993).

Following service of that subpoena, Eiland's lawyers filed on February 22, 1994, a written motion to have the subpoena quashed on the ground that Eiland's compelled testimony would violate his Fifth Amendment privilege against compelled self-incrimination. After argument from Eiland's lawyers and the State, Judge Ahalt ruled that there was no

residual danger of further incrimination and that Eiland was a compellable witness.

After that ruling, Eiland's lawyers indicated for the first time that, notwithstanding the order of the court, Eiland might still refuse to testify because of some intimidating conduct that had been directed toward him as he drove to court the day before. One of his attorneys narrated for the court what he had learned first from Eiland's sister and later from Eiland himself. Eiland had been subpoenaed to be present in court on the preceding day. He was to meet with his attorney at the attorney's office at 9:15 A.M. At 8:45 A.M., the attorney's office received a telephone call from Eiland's sister, Cynthia. The attorney described the substance of that call:

> Ms. Pearson indicated that she had received a telephone call from Gerald Eiland, that on his way to our office, after leaving his mother's home, where he spent the night, he saw a brown automobile with tinted windows that he had seen before. The car followed him, caught up with him. He tried to pull away from the car. He saw the car with tinted windows come down. He immediately had a great fear as to the fact that this might be—that some violence might be done to him.
>
> He tried to get away. The car struck the back of his vehicle, in what he perceived was an effort to cut him off and bring him to the side of the road. He did get away. We have learned that from Mr. Eiland, who we did not speak to in person until this morning.
>
> Mr. Eiland has indicated, and I expect that based upon what has occurred in this situation, that he feels that his safety cannot be guaranteed and that he is in great danger if he testifies in this case, and that it is his decision, I believe he will take the position, that the Court, having denied our motion to quash, he will take the position that he is unable to answer questions put to him by either side.

In an effort by all parties to confirm whether Eiland's refusal to testify would truly come to pass, Eiland was called

to the stand. He was sworn in as a witness and willingly answered preliminary questions that did not concern the shooting of Jay Bias. He refused to answer, however, any question touching on the crime or on the reason he felt he could not answer such questions:

Gerald Eiland, a witness on call of the State, after having been duly sworn was examined and testified as follows:

## Direct Examination

By Mr. Jackson:

Q: Mr. Eiland, would you please state your name for the record, and spell your last name for the Court Reporter?

A: Gerald Eiland.

.      .      .      .      .

Q: Please state your full name and address.

A: Gerald Eiland, 4317 29th Street, Southeast.

By Mr. Jackson:

Q: Mr. Eiland, did you shoot Jay Bias?

A: I can't answer that question.

.      .      .      .      .

By Mr. Jackson:

Q: Mr. Eiland, are you the same Mr. Eiland that testified in a previous proceeding?

A: I can't answer that question.

Mr. Jackson: Your Honor, I would ask the Court to direct the witness to answer the question.

The Court: Mr. Eiland, I'm going to order you to answer the questions that have been directed to you by Mr. Jackson.

The Witness: I can't answer that question.

By Mr. Jackson:

Q: Mr. Eiland, did you shoot Jay Bias?

A: I can't answer that question.

Q: Why can't you answer that question?

A: I can't.

Q: Were you in the car when Jay Bias was shot?

A: I can't answer that question.

Q: Why can't you answer that question?

A: I can't answer that question.

The Court: I think you need to continue further.

.    .    .    .    .    .

By Mr. Jackson:

Q: Were you in the Prince George's Mall on December 4, 1990?

A: I can't answer that question.

Q: And why can't you answer that question?

A: Because, I can't.

Q: Were you driving a green Mercedes that was occupied with Jerry Tyler at the Prince George's Mall on December 4, 1990?

A: I can't answer that question.

Q: And why can't you answer that question?

A: Because, I can't answer the question.

At that point, Judge Ahalt took over the questioning of Eiland. In the course thereof, he sternly advised Eiland that Eiland risked jail for contempt of court if he continued in his obstinacy:

The Court: Mr. Eiland, you understood the questions?

The Witness: Yes.

The Court: You understood that you have previously testified under oath in this courthouse concerning the issues and the facts to which the questions the State has asked are directed. Do you understand that?

The Witness: Yes.

The Court: Is there some reason that you want to articulate or express as to why you do not want to answer those questions?

The Witness: I can't answer that question.

The Court: All right. I am going to again order you to answer those questions. That is an order, that is a direct order. That is something that a judge of the judicial system has a right and authority to require individuals to answer questions directed to them.

The consequence of a witness failing or any individual failing to follow an order of court is potential contempt of court, which could involve potential loss of freedom through incarceration.

Do you understand what I have just said?

The Witness: Yes.

The Court: How old are you?

The Witness: Twenty-three.

The Court: How far have you been through school?

The Witness: Twelfth grade.

The Court: Do you read and write and understand the English language?

The Witness: Yes.

The Court: Are you in good health today mentally and physically?

The Witness: Yes.

The Court: Are you under any medication, alcohol or drugs today?

The Witness: No.

The Court: Are you the subject matter of any upsetness, accident or illness today?

The Witness: Excuse me?

The Court: Are you the subject of any upsetness, accident or illness today?

The Witness: Yes.

The Court: What is the nature of that?

The Witness: I mean, no.

The Court: What is the nature of that upsetness, accident or illness today?

The Witness: I can't answer that question.

That ended the examination of Eiland on March 3. The State moved to have Judge Ahalt find Eiland in contempt of court. In the course of the ensuing discussion between Judge Ahalt and counsel, the question arose as to whether Eiland's counsel deemed it beneficial to talk further with his client before the ultimate ruling was made. Counsel indicated that there was no purpose to be served:

Your Honor, I don't believe that any further opportunity for us to consult with the client will provide any benefit. I have made the proffer earlier that is under seal as to the client's reasons for saying what he has and for taking the position that he is taking.

He understands that the court does have the power, based upon the prosecutor's request to incarcerate him. Based upon the events of the past 24 hours and his continuous concerns about the situation, it's his election to respond to the questions as he did.

Before making his finding of contempt, Judge Ahalt asked if counsel could provide him with any additional details with respect to the automotive attack made on Eiland two days before. Counsel indicated that it occurred on Wheeler Road in the District as Eiland was driving toward Alabama Avenue in the general direction of the Bolling Air Force Base and his lawyer's office. He indicated further that there was a discernible dent on the car and that the car would be produced by a friend if anyone wanted to examine the dent.

Eiland's lawyers did reveal one other fact that may be of significance to us. When one of them had spoken to Eiland on the immediately preceding Tuesday afternoon about his scheduled court appearance on Wednesday morning, every indication was that he was ready to comply with whatever his testimonial obligation might be:

So as to Tuesday evening, he was ready to come to court, and [we] had every indication that he would, and [he] had told us that he would.

Judge Ahalt found Eiland to be in contempt of court. He ordered Eiland to be detained until he purged himself of the

contempt by being willing to testify. The State, at that juncture, offered as an exception to the Rule Against Hearsay the Prior Recorded Testimony of Eiland given under oath at his December 1993 trial. Tyler objected.

In an effort to obtain Eiland's live testimony, if at all possible, Judge Ahalt considered examining the jurors as to their availability and then continuing the trial for eighteen days to see if the pressure on Eiland would persuade him to comply with the court's order to testify. The State readily agreed to Judge Ahalt's suggestion. Tyler, however, despite having formally summoned Eiland as a defense witness, lost all apparent interest in encouraging him to testify at all. He strenuously opposed the continuance. Tyler's complaint that, with the lapse of two weeks, there would be "some fading of the testimony" seems contrived in that all of the testimony had been from the State's witnesses and the fading of memory, therefore, would almost certainly have been to the benefit of Tyler.

Tyler seemed certain, moreover, that no amount of jail time would succeed in persuading Eiland to change his mind. Tyler continued, despite the clear ruling of Judge Ahalt to the contrary, to characterize Eiland's reason for refusing to testify as one based on the Fifth Amendment privilege and not on the fear and intimidation proffered by Eiland's counsel. The trial was then recessed from March 3 until March 21.

On March 21, Eiland was again put on the stand and placed under oath. He gave his name for the record and then responded to ten questions from the prosecutor with five replies of "I can't answer that question" interspersed with five alternating replies of "Because I can't." Judge Ahalt sought to be of help and received three replies of "No." Tyler's counsel then received two replies of "I can't answer that."

### The Evidentiary Ruling

Based on the necessity occasioned by Eiland's contemptuous refusal to answer questions, Judge Ahalt ruled that the State could introduce the transcript of Eiland's testimony from

Eiland's own trial in December 1993. The State then read that testimony to the jury. The propriety of that evidentiary ruling is now the key issue on this appeal.

Coincidentally, Judge Ahalt determined that the transcript qualified as the "firmly rooted exception" to the Rule Against Hearsay generally known as Former Testimony, sometimes referred to as Prior Recorded Testimony. Judge Ahalt determined, in the alternative, that even if the transcript should not automatically qualify under the aforesaid "firmly rooted exception," it would nonetheless qualify even as generic hearsay because it bore "particularized guarantees of trustworthiness," *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514, 528 (1986), and was, therefore, "at least as reliable as evidence admitted under a firmly rooted hearsay exception," *Idaho v. Wright,* 497 U.S. 805, 821, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638, 656 (1990). *See Chapman v. State,* 331 Md. 448, 456–58, 628 A.2d 676 (1993); *Simmons v. State,* 333 Md. 547, 558–59, 636 A.2d 463 (1994).

As we undertake our analysis, let it be clear what we are reviewing. We are reviewing the ruling that the evidence was admitted—and nothing more. If the ruling was correct for the reasons advanced by the trial judge, it will be affirmed. If it turns out to have been correct for any other reason, it will also be affirmed. We are not scrutinizing the trial court's reasoning in arriving at his decision. We are scrutinizing the naked decision itself. *State v. Breeden,* 333 Md. 212, 227 n. 5, 634 A.2d 464 (1993); *Robeson v. State,* 285 Md. 498, 502, 403 A.2d 1221 (1979); *Aubinoe v. Lewis,* 250 Md. 645, 649, 244 A.2d 879 (1968).

### *Former Testimony*

We agree with Tyler that the transcript did not qualify as the "firmly rooted exception" of Former Testimony. Although Maryland Rule of Evidence 5–804(b)(1), effective on July 1, 1994, was not in effect, as such, at the time of Tyler's trial, it accurately reflects the pre-existing Maryland case law

on the classic Hearsay Exception known as Former Testimony:

### (b) Hearsay Exceptions

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

### (1) Former Testimony

Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, *if the party against whom the testimony is now offered,* or, in a civil action or proceeding, a predecessor in interest, *had an opportunity* and similar motive *to develop the testimony by* direct, *cross,* or redirect *examination.* (Emphasis supplied.)

Although every other criterion for admissibility as Former Testimony was indisputably satisfied, Tyler, as a non-party, had no opportunity to examine Eiland at Eiland's separate trial in December 1993. The State's interest in cross-examining Eiland at that trial was not remotely *in pari materia* with what Tyler's interest would have been. Eiland was in the act of laying off all of the blame on Tyler. Tyler's interest would have been to forfend that transference of blame *in toto* and to pile all of it on Eiland alone. The State was content to have Eiland unload the lion's share of the blame onto Tyler, just so long as it could keep some subsidiary or accomplice-level blame on Eiland. The State was not positioned to serve as a surrogate cross-examiner for Tyler. The transcript, therefore, did not qualify as Former Testimony.

### *The Larger Issue*

We share the outlook on this trial, indeed on this whole series of three trials over a four-year period, expressed by Judge Ahalt as he first encountered the contemptuous recalcitrance of Eiland in his refusal to abide by the judge's order and to answer the questions put to him:

I further conclude that he has been asked relevant questions of inquiry in the trial that we are presently in the process of conducting; that he has no justified reason for not testifying. He has testified fully and openly and completely in a prior proceeding concerning these same events.

I further conclude that his failure to testify could result in a substantial interference with the right of the public to proceed in a public adjudication and a full revelation of all facts, and the truth of the matter that is in question before this Court, and because of his unfounded, unjustified refusal and unarticulated refusal, there is a substantial public safety concern with respect to the abilities of our community to bring justice in an orderly open fashion.

Judge Ahalt then repeatedly stated that his primary interest was in discovering a way "where *substantial justice* [could] be done *for the community*." (Emphasis supplied.) Whatever may be the ability of lawyers to appreciate the procedural niceties that can produce aberrational results, the common-sense-oriented perception of the public contains a hard kernel of countervailing validity. A senseless killing shocked a community. It is undisputed that the lethal bullets were fired by Tyler or Eiland. Largely through the procedural device of obtaining a trial severance to which they were not necessarily entitled, each might point an uncontradicted finger of blame at the other and thereby walk out of the courtroom.

In the public eye, two clever and manipulative defendants, one of whom at the very least was necessarily guilty, would thereby make a laughingstock out of the criminal justice system. Judge Ahalt was loathe to let that happen. Under these circumstances, we are loathe to hold that he abused his discretion in a heroic effort "to keep the balance true." Whatever the formal issues on this appeal may be, there looms the larger and transcendent question, "Can the law allow Tyler and Eiland, individually or collectively, to get away with this?" The answer may turn out to be "Yes," but only after we have exhausted every effort to see if Judge Ahalt's evidentiary ruling can reasonably be sustained, either on the basis advanced by him or on some other basis.

### *Nance v. State*

The promise of a redeeming affirmance may lie in *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993), with a plausible "pushing out of the envelope" at one of *Nance*'s edges. In *Nance*, the Court of Appeals wrought a dramatic change in the Maryland law of evidence. If one sought to capture the central meaning or core significance of that change in an identifying label or incisive title, that label or title would inevitably be something closely resembling "Counteracting the Turncoat Witness." Indeed, in the opening bar of the *Nance* opinion, Judge McAuliffe sounded its *leitmotif:* "This case presents the classic evidentiary problem of the turncoat witness." 331 Md. at 552, 629 A.2d 633. The threshold question becomes, "Does Gerald Eiland qualify for the category 'Turncoat Witness'?"

### A. *Was Eiland a Turncoat Witness?*

■ Gerald Eiland was a quintessential turncoat witness. At his separate trial in December, 1993, he took the stand and, under oath, narrated in exquisite detail the events of December 4, 1990, at the Prince George's Plaza Mall immediately before the fatal shooting. He then expressly and articulately described how Tyler reached across his body and fired a number of shots into the Toyota in which Jay Bias was riding.

Eiland never at any time, before or after that testimony, took a different position or espoused a different version of the events. At the initial joint trial of himself and Tyler, to be sure, he did not take the stand, but the legal theory forcefully championed by his defense team was punctiliously consistent with his 1993 trial testimony. At no time did he ever give a different version to the police; to the prosecution; or, for all we know, to Tyler. Saving only the hurdle of whether he was legally entitled to invoke a testimonial privilege, there was every reason to believe that at Tyler's trial Eiland would testify (if not privileged) exactly as he had testified at his own separate trial. His own lawyers indicated, in a colloquy with Judge Ahalt, that as of Tuesday evening, the night before he

was scheduled to appear in court, they had "every indication" that "he was ready to come to court." No one, with the possible exception of Tyler, had any reason to anticipate his defiant silence.

Indeed, under circumstances far less compelling than those presented by Eiland's sworn testimony, we found in *Devan v. State*, 17 Md.App. 182, 190–91, 300 A.2d 705 (1973), that the State had every reason to anticipate favorable testimony against the defendant in that case from a former codefendant who had earlier entered a plea of guilty. Although the would-be witness there had not, at his own appearance before the court, taken the stand or given sworn testimony, he had stood acquiescently by when a statement of facts was recited. That acquiescence was deemed by us to be circumstantial evidence that the witness would subsequently testify in a manner consistent with that statement of facts:

> Hargrove stood mute. His plea of guilty before Judge Liss; the statement of facts recited in his and his counsel's presence; the trial judge's comments about Devan's connection with the robbery and expressed belief that Hargrove would so testify, constituted, by circumstantial evidence, acknowledgment by Hargrove that the statements were true and that he would testify in accordance with their tenor. Thus, by standing mute, his conduct naturally would be interpreted by the State as his statement that Devan participated in the robbery and that Hargrove would so testify.

17 Md.App. at 190–91, 300 A.2d 705.

Labelling the disappointing witness as a turncoat, however, requires, in addition to the element of testimonial disappointment, some consideration of the modality by which the witness turned his coat. The common denominator predicate would be that the initially promising witness, by virtue of 1) some earlier statement to the police or the prosecutor or others or 2) some earlier testimony before a grand jury or in the course of a trial, had given some indication that his trial testimony would be helpful to the party calling him. Eiland's earlier

trial testimony gave just such promise. The modalities for becoming a "turncoat" might then include:

1) Assuming the stand, taking the oath, and then repudiating the earlier statements [1] and also, perhaps, testifying to the contrary [2];

2) Assuming the stand, taking the oath, and then, without repudiating the earlier statements *per se*, casting those earlier statements in a far different interpretative light [3], effectively repudiating them without formally doing so;

3) Assuming the stand, taking the oath, and then professing selectively a convenient lapse of memory as to certain critical events [4] and also, perhaps, a convenient lapse of memory as to ever having made the earlier statements [5];

---

1. "At trial, the witnesses recanted, . . . by disavowing their prior identifications and statements." *Nance,* 331 Md. at 556, 629 A.2d 633. "Harris sometimes repudiated his former answers." 331 Md. at 557, 629 A.2d 633. "[Brown] denied having identified by name any of the participants in the April 3 fight. He testified that the police forced him to make the January 22 statement to escape criminal charges himself. Brown averred that the answers recorded in the January 23 statement were false." 331 Md. at 558, 629 A.2d 633.

2. "Harris testified that he ran and hid during the shooting . . . [H]e repeatedly asserted that he did not see the killing." *Nance,* 331 Md. at 556, 629 A.2d 633. "[McCormick] denied that he had seen a fight involving Nance, Hardy, Matthew, and Carroll earlier on April 3." 331 Md. at 557, 629 A.2d 633.

3. "[Harris] acknowledged having viewed photo arrays and having put his signature on the pictures of Nance and Hardy, but contended that he merely indicated to police that they were persons he knew and recognized." *Nance,* 331 Md. at 557, 629 A.2d 633. "[McCormick] first stated that he did not remember selecting Nance's photograph, and later that he was simply pointing out someone he knew." 331 Md. at 557, 629 A.2d 633. "[Brown] explained that Hardy's letter to him about 'dealing with those things left unfinished' meant only that Brown was to find witnesses and bring them to court." 331 Md. at 558, 629 A.2d 633.

4. "At trial, the witnesses recanted . . . by . . . claiming no memory of . . . their prior identification and statements." *Nance,* 331 Md. at 556, 629 A.2d 633.

5. "As for the questions and responses implicating Petitioners in Carroll's death, Harris . . . sometimes stated he did not remember giving

4) Assuming the stand, taking the oath, and then professing a total lapse of memory as to the entire criminal episode and also, perhaps, a total lapse of memory about making any earlier statements [6]; and

5) Assuming the stand, taking the oath, and then refusing to answer any critical questions even when ordered to do so by the trial judge [7] and also, perhaps, refusing to give a reason for refusing to answer the questions.

We see no principled distinction between modalities No. 3 and No. 4, selective or total lapse of memory, on the one hand, and modality No. 5, refusing to answer questions, on the other hand. Edward W. Cleary, *McCormick on Evidence* 755 (3rd ed. 1984), considered the case of the witness who "seeks refuge in forgetfulness" and noted "the parallel to the witness who simply refuses to testify":

The witness who falsely asserts loss of memory is simply refusing to testify in a way that he hopes will avoid a collision with the judge. He is present in court, by definition, and subject to cross-examination. If his claim is false,

---

them." *Nance,* 331 Md. at 556–57, 629 A.2d 633. "[McCormick] said both that he did remember, and that he did not remember, giving a statement to the police. He remembered giving detectives his name, address, and date of birth; he acknowledged his signature on the statement. He stated that he did not remember the questions or his former answers concerning a drug turf war at the projects, the conversation in Bell's Carry Out, or the melee in which Carroll was beaten." 331 Md. at 557, 629 A.2d 633.

6. "Harris further testified that he did not remember his grand jury testimony. He acknowledged his signature on the November 26 statement, but asserted that he had no memory of the questions and answers concerning his encounter with Ernest Barnes, and no current memory of accompanying Barnes to the office of Matthew's lawyer." *Nance,* 331 Md. at 557, 629 A.2d 633. "McCormick testified that he had no memory of his appearance before the grand jury." *Id.* "[Harris] contended that he was steadily intoxicated by drugs throughout the months in question." 331 Md. at 557, 629 A.2d 633.

7. The posture here is subtly different from that dealt with in *Simmons v. State,* 333 Md. 547, 553–54, 636 A.2d 463 (1994), where the turncoat refused even to take the stand or to be sworn or to answer even the most innocuous of questions.

he is in principle at least liable to contempt proceedings, though perhaps less effectively than in cases of simple refusal.

There is no functional difference between the witness on the stand who responds with the litany "I can't remember," "I can't remember," "I can't remember" and another witness on the stand who responds with the essentially indistinguishable litany "I can't answer that question," "I can't answer that question," "I can't answer that question." To permit a turncoat witness to gain some tactical advantage by employing one modality of resistance rather than another strikes us as imprudent policy. We choose, to borrow a phrase from Kipling, "to treat those two impostors both the same."

## B. The Turncoat Witness vs. the Turncoat Non–Witness

In Maryland, at least, the entire evidentiary phenomenon epitomized by *Nance* is so new that inevitably we are operating, in instance after instance of considering *Nance*'s possible applicability, in still unmapped borderlands of the law. *See,* however, *Stewart v. State,* 104 Md.App. 273, 655 A.2d 1345 (1995) and *Makell v. State,* 104 Md.App. 334, 656 A.2d 348 (1995). The whole *Nance* arsenal, of course, is aimed at the turncoat witness, not at the turncoat non-witness. The immediate threshold problem is presented, therefore, of whether Eiland's testimonial defiance of Judge Ahalt's order qualified him, within the contemplation of *Nance,* as a turncoat witness rather than as a turncoat non-witness. It is a close question and although the equities are by no means unmixed, we conclude that Eiland was a "witness," as *Nance* uses that term of art.

At the outset, we would distinguish the situation in this case from that in *Simmons v. State,* 333 Md. 547, 636 A.2d 463 (1994). The difference is critical, even though slight. In *Simmons,* the recalcitrant witness "refused even to take the stand much less testify." 333 Md. at 554, 636 A.2d 463. He publicly declaimed, "I'm not taking an oath. I'm not going to testify." *Id.* In the present case, by contrast, Eiland took

the witness stand and took the oath. In response to questioning, he not only gave his name and address but showed a willingness to respond to various questions that he deemed to be innocuous. He only responded with "I can't answer that question" on an *ad hoc,* question-by-question basis. It seemed that his refusals to answer may have been triggered by his own assessment of what might be self-incriminating and that he was invoking, albeit contemptuously, his own privilege against compelled self-incrimination notwithstanding the judge's ruling that he was not entitled to do so. In the case of Eiland, there was nothing to prevent the fact finders from looking upon him, listening to him, observing his demeanor as he answered or refused to answer, and assessing him in some meaningful fashion. None of this occurred in *Simmons v. State.*

Another critical difference between this case and *Simmons v. State* should also be carefully noted. *Simmons* was dealing, 333 Md. at 559, 636 A.2d 463, with an individual's status of "unavailability" as a witness. It was dealing with that status, however, in the liberalized context of facilitating the admissibility of hearsay evidence. One's "unavailability" as a witness in the *Nance* context, by way of dispositive contrast, would serve as a bar to the admissibility of evidence. As will be discussed far more fully later in this opinion and has been firmly established by the Supreme Court, "unavailability" for one evidentiary purpose is by no means "unavailability" for all evidentiary purposes. In terms of facilitating the admission of evidence, the finding of "unavailability" in *Simmons* and a finding of "unavailability" in this case would point in diametrically opposite directions. Of this, however, more anon.

Before alluding again to the functional similarity between the respective responses, "I can't answer the question" and "I can't remember," we would note that even a refusal to answer a question, in the view and hearing of the jury, can have communicative content and substance. On this question, we find at least oblique support from the excellent and thought-provoking analysis of Judge Bloom in *Kulbicki v. State,* 102 Md.App. 376, 649 A.2d 1173 (1994). Although the procedural

postures of that case and of this differ significantly, there is a small but hard kernel of similarity that we find especially helpful.

In *Kulbicki*, the resolution of a key issue before this Court depended on the assessment and characterization of the testimony of a defense witness, Darryl Marciszewski. The precise issue was whether that witness's testimony was inconsistent with the testimony of two State's rebuttal witnesses so as to trigger the State's entitlement even to offer those witnesses in rebuttal. If the defense witness had truly communicated the message, as he did in so many words, that he did not kill the victim, there was nothing for the State's rebuttal witnesses to rebut and the decision to permit them to testify would have been error. 102 Md.App. at 383–84, 649 A.2d 1173.

The State, however, argued that although the witness's spoken words had conveyed one message, the combination of his demeanor and his initial refusal to answer the critical question conveyed a diametrically different "unspoken message." Judge Bloom summed up the thrust of the State's argument that the witness had managed to convey, though not in so many words, a message that was inconsistent with the testimony offered by the rebuttal witnesses:

> [The State] argued that, although the testimony of Ms. Czajkowski and Ms. Dean did not rebut Marciszewski's spoken testimony, it did rebut the unspoken message that he was conveying. In other words, the State asserts that Marciszewski's testimony consisted not only of what he said but also the manner in which he said it. The State contends that the unspoken message conveyed by Marciszewski was that he, not the appellant, committed the murder, so the testimony of Ms. Dean and Ms. Czajkowski concerning Marciszewski's plan to exonerate appellant was proper rebuttal evidence.

102 Md.App. at 384, 649 A.2d 1173.

At the outset, this Court, through Judge Bloom, confirmed the validity of the State's position that testimonial or commu-

nicative content is not to be derived solely from the words a witness speaks:

> We recognize that, although a person's spoken words may technically convey one message, the implied message that is actually conveyed can contradict the spoken words.

102 Md.App. at 385, 649 A.2d 1173.

In support of its position that the alternative and unspoken message had actually been the one delivered, the State offered four items. Two were peripheral bits of circumstantial evidence, one acknowledging anger toward the murder victim and the second linking the witness as well as the defendant with an arguably incriminating jacket. The third item was the witness's inability to remember his whereabouts on the day of the crime. The fourth item, of particular significance for us, was the initial refusal to answer a critical question:

> The State also relies on the fact that Marciszewski, during cross-examination, twice refused to answer when the State asked him whether he killed Ms. Neuslein, and answered only after the trial judge threatened to hold him in contempt of court.

102 Md.App. at 384–85, 649 A.2d 1173.

We held that the unspoken message had been the one actually delivered and that the rebuttal witnesses, who contradicted and impeached that message, had been properly permitted to testify. The communicative content of that unspoken message, moreover, was derived, at least in part, from the refusal of the witness on two occasions to answer the critical question. Judge Bloom explained the reasons for our conclusion in that regard:

> His prior direct testimony, *coupled with the fact that he twice refused to answer when asked on cross-examination whether he murdered Ms. Nueslein,* could have led, and was perceived by the court as designed to lead, the jury to infer that he was guilty of murdering her ... (Emphasis supplied.)

102 Md.App. at 385, 649 A.2d 1173.

It is true, to be sure, that the refusal of the witness to answer a question in the *Kulbicki* case did not occur in a

vacuum but in conjunction, rather, with other testimonial behavior, whereas in the case before us Eiland's refusal stands essentially alone. The common denominator, however, is that *a refusal to answer is* nonetheless *testimonial behavior that possesses*, in and of itself, *possible communicative content.* If, qualitatively speaking, a refusal to answer is, as *Kulbicki* has established, a legitimate factor in a larger communicative equation, it is not utterly bereft of communicative significance even when standing alone. What was sufficiently inconsistent in *Kulbicki* to permit rebuttal testimony was sufficiently inconsistent in this case to permit the introduction of the prior inconsistent statement. The refusal to testify that contributed to the triggering inconsistency in *Kulbicki* constituted the triggering inconsistency in this case.

The bottom line is that a hearsay declarant who is present in the courtroom, who takes the witness stand, who is administered the oath, who answers some innocuous questions, but who then refuses to answer more critical questions is not in the same category as other hearsay declarants who are dead or missing beyond the seas.

The appellant argues that even if Eiland was present in the courtroom and on the witness stand and under oath and vulnerable to have questions put to him, there could be no meaningful cross-examination or confrontation if the answer to every non-innocuous question was probably going to be, "I can't answer the question." The complaint in this regard is essentially indistinguishable from what it would be if the probable answers were consistently going to be, "I can't remember." It is, therefore, to the cases, both from the Supreme Court and from this Court, dealing with the effect of loss of memory on the availability for cross-examination that we must look for guidance.

In *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985), the loss of memory by a critical expert witness was significant, albeit not total. The Supreme Court held that that did not deny the defendant the opportunity to cross-examine:

> [I]t does not follow that the right to cross-examine is denied by the State whenever the witness' lapse of memory impedes one method of discrediting him ... Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. (Emphasis in original.)

474 U.S. at 19–20, 106 S.Ct. at 294. *See also Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631, 643 (1987).

In *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court affirmed the conviction, against a Confrontation Clause challenge, on other grounds and, therefore, did not find it necessary to decide the admissibility of a key witness's out-of-court statement to a police officer concerning events that at trial he was unable to recall. The scholarly concurring opinion of Justice Harlan, however, would have addressed that issue and would have concluded:

> The fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence.

399 U.S. at 188, 90 S.Ct. at 1951. (Concurring opinion by Harlan, J.). That concurring opinion by Justice Harlan became the law of the land eighteen years later in *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951, 957 (1988):

> Here that question is squarely presented, and we agree with the answer suggested 18 years ago by Justice Harlan. "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (Emphasis in original.)

*United States v. Owens* is a strong case in point. The victim of a brutal assault was unable to recall the identity of

his assailant and was largely unable to recall the circumstances of a hospital room interview in which he identified the defendant as his assailant. At issue was the admissibility of a third party's testimony to the effect that the victim had, from the hospital room, made such an identification. Justice Brennan, in dissent, described the inability of the defendant to conduct a meaningful cross-examination because of the memory loss as being virtually as abject as would have been the case if the declarant had been dead or had asserted a testimonial privilege:

> The principal witness against respondent was not the John Foster who took the stand in December 1983—that witness could recall virtually nothing of the events of April 12, 1982, and candidly admitted that he had no idea whether respondent had assaulted him. Instead, respondent's sole accuser was the John Foster who, on May 5, 1982, identified respondent as his attacker. This John Foster, however, did not testify at respondent's trial; the profound memory loss he suffered during the approximately 18 months following his identification prevented him from affirming, explaining, or elaborating upon his out-of-court statement just as surely and completely as his assertion of a testimonial privilege, or his death, would have.

484 U.S. at 566, 108 S.Ct. at 846. (Dissenting opinion by Brennan, J.). Notwithstanding the argument that the memory loss was an effective bar to any meaningful status as a witness subject to cross-examination, the Supreme Court approved the reception of the out-of-court identification:

> The weapons available to impugn the witness's statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.

484 U.S. at 560, 108 S.Ct. at 843.

In *Bullock v. State*, 76 Md.App. 85, 543 A.2d 858 (1988), *cert. denied*, 313 Md. 688, 548 A.2d 128 (1988), this Court dealt with a memory loss more severe than that suffered by the victim in *United States v. Owens*. On the critical question of the

identity of the defendant as the assailant, the victim's memory loss was total. The robbery victim had suffered a serious beating. He could not identify the defendant at trial. Although he had identified the defendant to a police officer in a street show-up shortly after the crime, the victim suffered a total memory blackout as to even have participated in that extrajudicial identification procedure. In his analysis, Judge Alpert pointed out that the memory loss in the *Bullock* case was total:

> This case is one step removed from *Owens,* however. In the case *sub judice,* the identifying witness could no longer remember having identified the appellant as his assailant and, consequently, the State did not attempt to identify appellant through the victim's testimony. Instead, the State had Deputy Chambers testify that Mr. Reinert had identified the appellant as his assailant at the show-up at the shopping center.

76 Md.App. at 92, 543 A.2d 858.

In *Bullock,* the victim's total lack of memory as to the identity of his assailant was such that the State did not even question him as to the defendant's criminal agency. Even under those circumstances, we held that the defendant's entitlement to call the victim as his own witness was fully as effective as would have been his opportunity to cross-examine him had the State used him as a witness on the issue of criminal agency:

> Mr. Reinert was available in the courtroom to be examined concerning his identification of appellant at the shopping center. We understand appellant's concern that he was not in a position where he could cross-examine Reinert about the show-up ... Under Maryland law, however, the opportunity to call Reinert as a witness and question him about the identification is sufficient to satisfy appellant's right to confront the witnesses against him.

76 Md.App. at 93, 543 A.2d 858.

Relying primarily on *United States v. Owens,* we held that the police officer's testimony as to the victim's identification of

the defendant was admissible as substantive evidence. The victim was present in court and subject to being called as a witness, notwithstanding the essential futility of trying to get anything out of him by way of meaningful cross-examination. Judge Alpert expressed the holding of the Court:

> [I]nsofar as Reinert's lack of memory is concerned, as we noted *supra,* the Supreme Court held in *Owens* that a witness's testimony that he had previously identified the defendant as the perpetrator of a crime was admissible even though he could not then identify the defendant as his attacker. We recognize that in this case, unlike in *Owens,* Reinert could no longer remember identifying the defendant. We believe, however, that this also bears only on the weight to be given the identification by the trier of fact.

76 Md.App. at 94, 543 A.2d 858.

Eiland was present in the courtroom, just as was the robbery victim in *Bullock.* Eiland took the oath and was subject to being questioned, just as did the robbery victim in *Bullock.* In neither case was there any realistic likelihood of getting anything out of the witness, either on direct or cross-examination. We see no distinction between Eiland's status as a witness and that of the robbery victim in *Bullock.*

In terms of satisfying one of the threshold requirements of *Nance* and of Md.Rule 5–802.1, our narrow focus for the moment is on the isolated question of whether Jerry Eiland was a "witness" or a "non-witness." There is a subtle but critically dispositive difference between the *recalcitrant non-witness* and the *recalcitrant witness.* Neither, to be sure, is willing to answer a question, but they manifest their non-cooperation in different ways and in different places. It is the recalcitrant *non-witness* who refuses even to take the stand, *Simmons v. State,* 333 Md. 547, 636 A.2d 463 (1994), or, perhaps, even to come to the courthouse. It is, by way of contrast, the recalcitrant *witness* who, on the stand and under oath, refuses to answer certain questions even when directed to do so by the trial judge.

Eiland in this case was present in the courtroom, voluntarily took the witness stand when called, voluntarily took the oath, voluntarily answered certain questions, and then contemptuously declined to answer other questions. His recalcitrance and his contempt, therefore, was that of a witness, not that of a non-witness.

His unprivileged refusal to answer certain questions did not, *ipso facto,* transform him from a witness into a non-witness. The case law holds that even a refusal by a witness to answer questions may still have evidentiary significance. *Kulbicki v. State,* 102 Md.App. 376, 649 A.2d 1173 (1994); *United States v. Hearst,* 563 F.2d 1331, 1341–42 (9th Cir.1977) ("Therefore, it was permissible for the Government to ask questions about this period, even though they led to 42 assertions of the Fifth Amendment."); *United States v. Beechum,* 582 F.2d 898, 909 (5th Cir.1978) ("Moreover, in that instance the Government would have been entitled to comment on Beechum's refusal to answer, notwithstanding the prohibition on such comment where the privilege is properly invoked.") Whatever other threshold requirements must be satisfied, Eiland was a "witness."

## C. The Threshold of "Availability" and Its Shifting Meaning

*Nance*'s threshold requirement that the hearsay declarant be a "witness" and its threshold requirement that the hearsay declarant be "available for cross-examination" may be completely co-terminous. Each may, on the other hand, largely overlap the other but still retain some subtle and unique quality of its own. In either event, we shall utilize the rubric of "availability for cross-examination" to analyze one important aspect of the threshold requirement not yet discussed. *Nance* provides, 331 Md. at 560, 629 A.2d 633:

It is well settled in Maryland that a court may admit, as substantive proof, evidence of a third party testifying as to an extrajudicial identification by an eyewitness. . . . *where the out-of-court declarant is present at trial and subject to cross-examination.* (Emphasis supplied.)

As to the use of prior inconsistent statements as substantive evidence, *Nance,* 331 Md. at 565, 629 A.2d 633, characterized the "modern rule" as sanctioning the substantive use of the statements "provided the declarant is present at trial and subject to cross-examination." The intermediate position championed by five states and adopted by *Nance* requires that the

> statement was reduced to a writing signed or adopted by the declarant, and the declarant is a witness at trial and subject to cross-examination.

331 Md. at 567–68, 629 A.2d 633. Its final holding in this regard, 331 Md. at 569, 629 A.2d 633, is that the prior inconsistent statement is substantive evidence if the declarant

> is subject to cross-examination at the trial where the prior statement is introduced.

With respect to the admissibility of prior grand jury testimony, *Nance,* 331 Md. at 571, 629 A.2d 633, held:

> The declarant must also, of course, be present as a witness at trial to be tested by cross-examination in regard to the former grand jury appearance and its contents.

The crucial question becomes that of defining the notion of "unavailable for cross-examination" or "unavailable as a witness." The law dealing with the *admissibility* of evidence pursuant to those hearsay exceptions that require the unavailability of the declarant, on the one hand, defines "unavailability" liberally. Both Federal Rule of Evidence 804(a) and Maryland Rule of Evidence 5–804(a) treat, in *verbatim* language, as "unavailable" declarants not only those who are dead, insane, absent beyond the seas, of whereabouts unknown, or shielded by a testimonial privilege, but also a declarant who

> (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so [8]; or

---

**8.** *See, e.g., Gaskins v. State,* 10 Md.App. 666, 677–78, 272 A.2d 413, *cert. denied,* 261 Md. 724 (1971).

(3) testifies to a lack of memory of the subject matter of the declarant's statement;

The law of evidence, however, has made a subtle but critical distinction between the meaning of "unavailability" in that context and the meaning of "unavailability" in the very different context presented by this case. Both new Maryland Rule of Evidence 5–804(a)(3) and Federal Rule of Evidence 804(a)(3), for instance, treat the forgetful witness as sufficiently "unavailable" for the purpose of promoting the freer admissibility of certain hearsay exceptions. *Nance*, on the other hand, does not treat the forgetful witness as "unavailable" for the diametric purpose of *barring* the admissibility of evidence. "Unavailability" as a key and "unavailability" as a bar are not treated the same way.

As the *Nance* case illustrates, there is a decided liberalizing trend in the law of evidence favoring the freer admissibility of evidence. One manifestation of that trend is the facilitating of the *admissibility* of evidence under those hearsay exceptions that are contingent on the unavailability of the hearsay declarant, or more precisely the unavailability of the testimony of the hearsay declarant. Involved here, of course, is the small cluster of exceptions collected under Federal Rule of Evidence 804 and under Maryland Rule of Evidence 5–804, featuring such prominent members as Dying Declarations, Former Testimony, and Declarations Against Interest.

With the Dying Declaration, of course, the requisite showing of unavailability remains as morbid as it always has been. With regard to the other exceptions in this group, however, the law of evidence is quick to find "unavailability," as a key to *admissibility*, in a number of circumstances. Let it be carefully noted, however, that that is a context in which a finding of unavailability is the necessary avenue for *admissibility*. Everything that suffices to get evidence in does not necessarily suffice to keep evidence out. That is a far cry from a situation, such as in *Nance*, where a finding of unavailability for cross-examination triggers not a liberalizing *admissibility*

but a foreclosing *inadmissibility*. Whereas admissibility is favored, inadmissibility is disfavored.

*Nance* is a good illustration of how attitude may shift with changing context and changing purpose. The lapse of memory by a witness, which would easily have constituted the necessary unavailability to permit the introduction of Former Testimony or a Declaration Against Interest, was held not to constitute unavailability so as to bar the introduction of the prior inconsistent statements.

The Supreme Court, moreover, has never found a witness's loss of memory to represent the unavailability for cross-examination that will *bar* the introduction of evidence. *Cf. Delaware v. Fensterer*, 474 U.S. 15, 19–22, 106 S.Ct. 292, 294–96, 88 L.Ed.2d 15, 19–21 (1985); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

The apparent anomaly that a witness might be deemed "unavailable for cross-examination" so as to facilitate admissibility under Federal Rule of Evidence 804(a)(3) or Maryland Rule of Evidence 5–804 under circumstances that would not be deemed "unavailable for cross-examination" so as to bar admissibility under Federal Rule of Evidence 801(d)(1)(C) or Maryland Rule of Evidence 5–802.1(a) was dealt with squarely in *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). A federal prison counselor suffered a brutal beating to the head with a metal pipe. His skull was fractured and he was hospitalized for almost a month. His memory was severely impaired. While in the hospital the victim was interviewed by an FBI agent and identified Owens as his assailant. He selected a picture of Owens from a photographic array. At trial, however, the victim had almost a total lapse of memory as to both the initial attack and as to the hospital visits and interviews.

A prerequisite to the admissibility of the photographic identification, under Federal Rule of Evidence 801(d)(1)(C), is that the victim be available for cross-examination. The Supreme Court, through Justice Scalia, held that the memory loss did not render the victim "unavailable for cross-examina-

tion" and that the evidence of identification was, therefore, admissible.

Justice Scalia freely acknowledged, however, that the memory loss that did not represent "unavailability" under Rule 801(d)(1)(C) would nonetheless represent "unavailability" under Rule 804(a)(3). He explained that the more liberal attitude taken under Rule 801(d)(1)(C) was because the admissibility of the evidence is favored:

> The premise for Rule 801(d)(1)(C) was that, given adequate safeguards against suggestiveness, out-of-court identifications were generally preferable to courtroom identifications.... [D]espite the traditional view that such statements were hearsay, the Advisory Committee believed that *their use was to be fostered rather than discouraged.* (Emphasis supplied.)

484 U.S. at 562, 108 S.Ct. at 844. Owens leaped on the inconsistency:

> Respondent argues that this reading is impermissible because it creates an internal inconsistency in the Rules, since the forgetful witness who is deemed "subject to cross-examination" under 801(d)(1)(C) is simultaneously deemed "unavailable" under 804(a)(3).

484 U.S. at 563, 108 S.Ct. at 844. In dismissing the significance of the apparent inconsistency, Justice Scalia explained that the two rules serve two very different policies:

> It seems to us, however, that this is not a substantive inconsistency, but only a semantic oddity resulting from the fact that Rule 804(a) has for convenience of reference in Rule 804(b) chosen to describe the circumstances necessary in order to admit certain categories of hearsay testimony under the rubric "unavailability as a witness." These circumstances include not only absence from the hearing, but also claims of privilege, refusals to obey a court's order to testify, and inability to testify based on physical or mental illness or memory loss.

*Id.* The very different treatment of the concept of unavailability for cross-examination simply

presents the verbal curiosity that the witness is "subject to cross-examination" under Rule 801 while at the same time "unavailable" under Rule 804(a)(3). *Quite obviously, the two characterizations are made for two entirely different purposes and there is no requirement or expectation that they should coincide.* (Emphasis supplied.)

484 U.S. at 563–64, 108 S.Ct. at 845.

*California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), also demonstrates that "unavailability" for one purpose is not necessarily "unavailability" for all purposes. A 16–year–old accomplice testified against the defendant at a preliminary hearing. At the trial, two months later, the witness was sworn but then proved to be "markedly evasive and uncooperative on the stand." 399 U.S. at 151, 90 S.Ct. at 1931. He claimed that he was on "acid" (LSD) at the time of the crime and "was unable to remember the events." *Id.* He asserted that "the drugs he had taken prevented his distinguishing fact from fantasy." *Id.*

The Supreme Court held that the Former Testimony from the preliminary hearing was admissible. It pointed out that "the State here has made every effort to introduce its evidence through the live testimony of the witness; it produced Porter at trial, swore him as a witness, and tendered him for cross-examination." 399 U.S. at 167, 90 S.Ct. at 1940. It then essentially equated inconsistent testimony, a claimed loss of memory, the invoking of a testimonial privilege, and the refusal to answer questions:

> Whether Porter then testified in a manner consistent or inconsistent with his preliminary hearing testimony, claimed a loss of memory, claimed his privilege against compulsory self-incrimination, or simply refused to answer, nothing in the Confrontation Clause prohibited the State from also relying on his prior testimony to prove its case against Green.

399 U.S. at 167–68, 90 S.Ct. at 1940. The Court further observed that a loss of memory is classically a sufficient

showing of "unavailability" to open the gate for the Former Testimony hearsay exception:

> The hearsay exception itself has generally recognized that a witness is "unavailable" for purposes of the exception where through lapse of memory or a plea of the Fifth Amendment privilege, the State cannot secure his live testimony.

399 U.S. at 168 n. 17, 90 S.Ct. at 1940 n. 17.

In addition to the Former Testimony from the preliminary hearing, the State also introduced as substantive evidence prior inconsistent statements given to a police officer under the "modern rule" which goes even further than *Nance.* The California Supreme Court had not found it necessary to consider whether the witness's memory loss rendered him "unavailable for cross-examination" or not for purposes of that evidentiary ruling. The United States Supreme Court remanded so that California might consider that question.

For our present purposes, the significance of the Supreme Court remand is that its holding that the witness was "unavailable" so as to legitimate the admission of the transcript from the preliminary hearing under the Former Testimony hearsay exception by no means automatically or *ipso facto* settled the different "unavailability" question for prior inconsistent statements. The separate contexts required separate resolutions of that issue.

Similarly, case law as to what constitutes unavailability under Maryland Rule of Evidence 5–804 and its predecessor law, *see, e.g., Gaskins v. State,* 10 Md.App. 666, 677–78, 272 A.2d 413, *cert. denied,* 261 Md. 724 (1971), has little bearing on the very different question of unavailability for cross-examination under Maryland Rule of Evidence 5–802.1(a) and *Nance v. State.* A trial judge is vested with wide discretion when it comes to a ruling to admit evidence. A reviewing court is enjoined to reverse only in cases of clear abuse.

### D. Nance's Response to Turncoat Witnesses

Once the threshold requirement (or requirements) has been satisfied that the hearsay declarant is both 1) a witness and 2)

available for cross-examination, *Nance*'s restorative antidotes are available for use. *Nance*'s response to the turncoat witnesses in that case was three-fold. The first third of the response was unremarkable. Two of the witnesses had been eyewitnesses to the fatal shooting. Within twenty-four hours of the commission of the crime, both witnesses had identified, from photographic arrays, the defendant Nance as one of the perpetrators. One of those witnesses identified the codefendant Hardy as well. At trial, both witnesses repudiated, in effect, their pretrial identifications by claiming that they had only identified the photographs as being photographs of persons they knew and recognized.

With respect to the admissibility as substantive evidence of those extrajudicial identifications, the Court of Appeals reaffirmed preexisting Maryland law that such evidence was both admissible and legally sufficient to support a conviction:

> It is well settled in Maryland that a court may admit, as substantive proof, evidence of a third party testifying as to an extrajudicial identification by an eyewitness when made under circumstances precluding the suspicion of unfairness or unreliability, where the out-of-court declarant is present at trial and subject to cross-examination. An extrajudicial identification is sufficient evidence of criminal agency to sustain a conviction, even though the declarant is unable to identify the accused at trial. (Citations omitted.)

331 Md. at 560–61, 629 A.2d 633. Indeed, *Bullock v. State* was a classic application of this aspect of the *Nance* Rule five years before the *Nance* opinion was handed down.

It was in the second of its three responses to the problem of the turncoat witness that the *Nance* opinion broke dramatic new ground. All three of the ultimate turncoat witnesses in that case had been interviewed by the police about events which they had observed first-hand. They had all provided full and descriptive answers. All of their prior statements had been reduced to writing, were read and vouched for by the witnesses, and were then signed by the witnesses. When the witnesses recanted at trial, either by direct repudiation or by

claimed lapse of memory, the trial judge admitted the prior written statements.

Judge McAuliffe began his analysis by pointing out, 331 Md. at 564, 629 A.2d 633, that Maryland traditionally permitted the use of a prior inconsistent statement only in its non-hearsay capacity for the limited purpose of impeaching the testimonial credibility of the witness on the stand. He further observed that "Maryland is one of only a handful of states to adhere to the orthodox rule barring use of prior inconsistent statements as probative evidence." 331 Md. at 565, 629 A.2d 633.

After a thorough analysis of the merits and demerits of the so-called "modern rule," already adopted by sixteen states, whereby prior inconsistent statements are broadly admissible as substantive evidence, the *Nance* Court took the more cautious approach, adopted by five other states, of moving part-way toward the "modern rule." It held:

> We hold that the factual portion of an inconsistent out-of-court statement is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced. (Footnote omitted.)

331 Md. at 569, 629 A.2d 633. *See also Sheppard v. State,* 102 Md.App. 571, 650 A.2d 1362 (1994).

The third prong of *Nance*'s tridentate response to the turncoat witness also has major new significance. It deals with a prior inconsistent statement given by a witness in some formal setting and under oath. It followed the lead of Fed. R.Evid. 801(d)(1)(A) in deeming statements given under such circumstances to be sufficiently reliable to be received as substantive evidence. Judge McAuliffe explained the reliability rationale:

> The requirement of a formal context such as a judicial hearing or grand jury proceeding assures that the declarant did indeed make the prior statement. There will be no doubt that it was accurately recorded and transcribed. The

requirements of an oath and testimony given under penalty of perjury discourage lying, reminding the declarant of punishment by both supernatural and temporal powers. The formal setting, oath, and the reminder of perjury all convey to the declarant the dignity and seriousness of the proceeding, and the need to tell the truth. (Citation omitted.)

331 Md. at 571, 629 A.2d 633.

In the *Nance* case itself, the three turncoat witnesses had all recanted, by direct repudiation or by lapse of memory, their earlier grand jury testimony. Transcripts of their grand jury testimony were admitted. In affirming that ruling by the trial judge, the *Nance* opinion noted:

[A] statement given before a grand jury is made in an atmosphere of formality impressing upon the declarant the need for accuracy; and it will be memorialized in a manner that eliminates concerns about whether the statement was actually made.

*Id.*

The second and third of *Nance*'s responses to the turncoat witness have since been brought together under the umbrella of the new Md. Rule of Evidence 5–802.1(a). Although the new Rule of Evidence did not take effect until July 1, 1994, after Tyler's trial in this case had been completed, the new Rule simply reflects the changes made in Maryland law by the *Nance* opinion. Rule 5–802.1(a) provides:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

(a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement.

The three qualifying conditions spelled out by subsection (a) are in the disjunctive. It is clear that Eiland's sworn testimony at his December, 1993 trial would redundantly qualify under either (1) or (3). It was testimony given under oath subject to the penalty of perjury at a trial. It was also recorded in *verbatim* fashion by stenographic means at the very time it was given.

Subsection (a) begins with the more general condition that the trial testimony being offered be "inconsistent with the declarant's testimony." At Tyler's trial, Eiland was in court in answer to a subpoena. He took the stand and was administered the oath. He answered certain innocuous questions. His earlier testimony, of course, had been that he was in the Mercedes with Tyler when Tyler fired the lethal shots. For purposes of establishing inconsistency, we focus in on two sets of questions and answers:

Q: Mr. Eiland, did you shoot Jay Bias?

A: I can't answer that question.

Q: Were you in the car when Jay Bias was shot?

A: I can't answer that question.

We hold that those responses were just as inconsistent with Eiland's earlier trial testimony as those responses would have been had they taken the following form:

Q: Mr. Eiland, did you shoot Jay Bias?

A: I can't remember.

Q: Were you in the car when Jay Bias was shot?

A: I can't remember.

In *Nance*, the argument was made by the defendants that the claimed loss of memory on the part of the witnesses denied the defendants any chance of cross-examining the witnesses. The Court of Appeals rejected the defense argument. Inferring that the claimed lapses of memory were not genuine, the Court of Appeals treated the selective and conve-

nient gaps in memory as if they were nothing less than devious ways of refusing to answer:

> All of the variations upon the rule permitting probative use of out-of-court identifications and statements require that the defendant be present at trial for cross-examination. Petitioners argue that the witnesses' claimed loss of memory at trial about past events effectively denied the defense any real chance to cross-examine them about their out-of-court identifications and statements. Both the facts and the law refute that argument.

> Harris, McCormick, and Brown did not uniformly testify that they had no memory of their sessions with police or the grand jury in which they made the identifications or statements. Instead, they remembered some parts of these earlier events, did not remember others, and outright denied or repudiated other parts. Their lapses of memory conspicuously occurred whenever the questions at trial approached matters potentially implicating Nance and Hardy in the murder. The tendency of unwilling or untruthful witnesses to seek refuge in forgetfulness is well recognized.

331 Md. at 571–72, 629 A.2d 633.

The Court would not permit such responses to be treated as the denial of an opportunity for cross-examination which would thereby compel the rejection of the evidence:

> When witnesses display such a selective loss of memory, a court may appropriately admit their prior statements.

331 Md. at 572, 629 A.2d 633. There is no principled difference between what the witnesses did there and what Eiland did here.

In *California v. Green*, 399 U.S. 149, 153–64, 90 S.Ct. 1930, 1932–38, 26 L.Ed.2d 489, 494–501 (1970), the Supreme Court placed its constitutional imprimatur, as non-violative of the Confrontation Clause, not only on the more cautious approach to greater substantive admissibility represented by *Nance* and adopted by five other states, but also on the even broader "modern rule" generally.

### E. Cross–Examination "Concerning the Statement"

In yet another regard, the appellant is procedurally handicapped in contending that Eiland was not available for cross-examination. The contention is pure speculation, for the appellant never made the slightest effort to cross-examine Eiland.

Let it be noted initially that Md. Rule 5–802.1, which essentially codifies the holding in *Nance v. State*, does not condition the admissibility, for substantive purposes, of the prior inconsistent statement on the fact that the out-of-court declarant is available or subject to cross-examination generally. The literal threshold requirement is that the out-of-court declarant be one "who is subject to cross-examination *concerning the statement.*" (Emphasis supplied.)

The appellant may well make the argument that, in terms of Eiland's live testimony, the appellant had neither opportunity nor desire to cross-examine until Eiland had given testimony adverse to the appellant's cause. That is not the type of cross-examination, however, of which the rule speaks. It speaks exclusively of cross-examination "concerning the statement." Once the testimony from Eiland's earlier trial had been introduced, there was abundant subject matter for the appellant to explore on cross-examination. That, indeed, was the specific type of cross-examination contemplated by *Nance v. State.* After the witnesses had been subjected to direct examination in *Nance,* their prior statements, to police and grand jury alike, were introduced for their substantive content. It was at that juncture that the availability of those witnesses for cross-examination with specific reference to those statements became critical:

> All three witnesses were extensively cross-examined by the defense at trial ... They testified that police had misinterpreted their prior remarks, falsely recorded them, or elicited them by coercion....

> In brief, the witnesses' testimony served largely to cast doubt on the State's evidence and thereby to exculpate the

defendants at trial, which is the aim of effective cross-examination by the defense in criminal cases.

331 Md. at 573, 629 A.2d 633.

Once Eiland's trial testimony had been introduced, there was much that the appellant might seek to do by way of cross-examining Eiland. Eiland had been present in the courthouse and had taken the stand twice, once before his eighteen-day travail and once afterward. On both occasions, he had been willing to assume the witness chair, take the oath, and answer certain questions. After his earlier trial testimony had been introduced, he was still available, presumably in the courthouse or, at most, in some nearby holding facility. Had the appellant requested the opportunity to put questions to Eiland, the court certainly would have accommodated him. The critical procedural factor, however, is that the appellant never made such a request.

He suggests that any effort to cross-examine would have been futile. We must point out that if for no other reason, it would not have been futile in terms of preserving the issue for appellate review. More significantly, the appellant was positioned for precisely the sort of cross-examination that was conducted in *United States v. Hearst*, 563 F.2d 1331 (9th Cir.1977). The cross-examination in *Hearst* consisted of forty-two consecutive questions followed by forty-two consecutive assertions of the Fifth Amendment privilege.

The appellant's purpose, of course, was to lessen the impact and impeach the credibility of Eiland's earlier trial testimony. A question to Eiland such as "Is it not true that you lied in your earlier trial testimony and placed the blame on Tyler simply to save yourself?" followed by a response of "I can't answer that question," would have had significant impact in casting doubt on that earlier testimony. A series of forty-two such questions and responses, as in *Hearst*, might have blown Eiland's earlier trial testimony right out the window. The point is that the effort to cross-examine Eiland might have been anything but futile, but the appellant never made the effort. We can only surmise that the appellant may have been

in some state of delicate detente with Eiland that he did not wish to jeopardize by aggressive cross-examination. The decision to forego that cross-examination, for whatever reason, was his alone, and he must live with its procedural consequences.

### Responsibility for Unavailability

■ There is a second, and totally independent, reason why we cannot say that Judge Ahalt clearly abused his discretion. It is hornbook law that a party may not reap the benefit of a potential witness's unavailability if that party bears any responsibility for that unavailability. Edward W. Cleary, *McCormick on Evidence* 754 (3rd ed.1984) observes:

> [T]he witness may be physically present in court but his testimony nevertheless unavailable. Of course if the unavailability is by procurement of the party offering the hearsay statement, the requirement ought not to be regarded as satisfied.

Lynn McLain, 6 *Maryland Evidence* 445 describes the same principle:

> The unavailability must not be due to efforts to prevent the witness from testifying.

*And see Bartell v. Bartell,* 278 Md. 12, 22–24, 357 A.2d 343 (1976); *Bryant v. State,* 207 Md. 565, 587, 115 A.2d 502 (1955); *Howell v. State,* 62 Md.App. 278, 289, 489 A.2d 55 (1985). In dealing with those hearsay exceptions that require a showing that the declarant be unavailable as a witness, Federal Rule of Evidence 804(a) provides:

> A declarant is not unavailable as a witness if his exemption, refusal, claim or lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

Maryland Rule of Evidence 5–804(a) similarly provides:

> A statement will not qualify under section (b) of this Rule if the unavailability is due to the procurement or wrongdo-

ing of the proponent of the statement for the purpose of preventing the witness from attending or testifying.

In the *Nance* setting, of course, the benefit of a showing of unavailability flows in the opposite direction. In a Rule 804 setting, the beneficiary of the showing of unavailability is the proponent of the hearsay exception. In a *Nance* setting, by contrast, the beneficiary of such a showing is the opponent of the prior inconsistent statement. The principle, however, is the same. As either a proponent or an opponent of hearsay evidence, a party may not benefit from the declarant's unavailability if that party bears, even inferentially, any responsibility for the unavailability.

In reviewing discretionary evidentiary rulings, we do not impose formal burdens of production or persuasion on what are, by their very nature, judgment calls. If there was in the surrounding circumstances some support for an evidentiary ruling—by reasonable inference, by logical deduction, by process of elimination, by some even non-verbal sense or "feel" of the trial mood—we would not label that ruling as a clear abuse of discretion.

In the present case, several different intimations, collectively if not individually, could have given rise to a permissible inference that Tyler, or perhaps his friends and adherents, bore some responsibility for Eiland's unavailability for cross-examination.

Time was when Tyler and Eiland were, if not exactly Damon and Pythias, at least fast friends. When they went to the Prince George's Plaza Mall together on December 4, 1990, Tyler and Eiland were already companions of long standing. For some time, Tyler, stripped of his driving privileges, had turned the use of his Mercedes over to Eiland. It was Tyler who wanted to go to the mall on December 4 and it was Eiland who accommodated him by serving as his chauffeur. Throughout the several confrontational episodes with Jay Bias and his friends, Tyler and Eiland presented a united front. The inference at least raises its head that Eiland might have

resorted to any reasonable measure, short of convicting himself, to keep from damaging testimonially his erstwhile friend.

As at least a modest additional makeweight, Tyler's strenuous insistence on a trial severance diminished the likelihood that he would ever be able to cross-examine Eiland. But for the trial severance, Tyler's determination to take the stand would almost certainly have triggered a reciprocal decision by Eiland. In such an eventuality, Tyler could have cross-examined Eiland with a will.

When on March 3, 1993, a possible trial recess was in the offing with an eye to compelling Eiland's live testimony, moreover, Tyler strenuously resisted the effort. Judge Ahalt considered and ultimately chose that course of action. The State was fully supportive of any device likely to produce Eiland's live testimony. Tyler, of course, had protected himself by issuing his own subpoena for Eiland to appear as a witness. To what end, it is hard to figure out. When strategies were being considered, however, to coerce Eiland to be a witness, Tyler strenuously resisted those strategies. He went out of his way to point out to Judge Ahalt the likely futility of even making the effort. A longer continuance, had Tyler not opposed it, might well have turned the tide in favor of Eiland's live testimony. The inference that Tyler thereby contributed to Eiland's continuing, even if not initial, unavailability for cross-examination would not have been irrational.

There finally looms the specter of witness intimidation. Tyler, of course, was in jail, but his friends and adherents were not. There is no direct evidence, to be sure, linking the "Tyler camp" to the alleged intimidation. The apparent victim of the intimidation would not reveal even that much. The process of elimination, on the other hand, overwhelmingly pointed in that direction. As one party to the trial, Judge Ahalt enjoyed an infallible vantage point to eliminate himself as the possible culprit. The State, for its part, had everything to lose and nothing to gain from scaring off a key State's witness. If it was to be believed that the intimidation actually

occurred (and there was a reasonable basis for so believing) Eiland would have had no need to intimidate himself.

By process of elimination, whom does that leave? Tyler obviously had much to gain. If he had fended off first Eiland's live testimony and then the transcript of Eiland's earlier trial testimony, Tyler might have walked out of the courtroom with a not-guilty verdict. Of all the parties with a possible interest in Eiland's testimony, only Tyler (or Tyler's supporters) had a motive to derail it.

*Nance* took a particularly dim view of witness intimidation. It described how one of the turncoat witnesses, Harris, "had been approached by one Ernest Barnes, a friend of the third suspect" and "feared Barnes would retaliate if he testified." 331 Md. at 555, 629 A.2d 633. It explained that Harris "was afraid, 'Cause every time he [Barnes] has a problem, about two days or a day after somebody's always getting beat up or hurt.' " *Id.* Another turncoat witness, Brown, had informed the police that a possible codefendant had warned him, "You don't know nothing," and had further informed the police that "he was afraid of the men he saw." 331 Md. at 556, 629 A.2d 633.

Despite subsequent testimonial denials by the witnesses that they had been threatened or that they were "deliberately pretending to forget the prior events out of fear," 331 Md. at 557, 629 A.2d 633, the Court of Appeals duly noted, "There was evidence that an atmosphere of fear and threats of reprisals existed in the interim between the crime and the trial." 331 Md. at 567, 629 A.2d 633. Similarly, there was evidence of such an atmosphere here.

A permissible inference could have been drawn by Judge Ahalt that Tyler, or those supporting him, were at least partially responsible, in one or more of these various ways, for Eiland's unavailability for cross-examination. Tyler, of course, may not benefit from that unavailability. Under the circumstances, the decision to admit the evidence was not a clear abuse of discretion.

### *A Responsive Comment*

The dissenting opinion argues that *Nance v. State* was not satisfied in this case in two regards: 1) that Eiland's trial testimony was not inconsistent with the testimony he gave at his own trial in December, 1993; and 2) that Eiland was not available for cross-examination by Tyler at Tyler's trial.

The dissent attempts to drive a wedge of distinction between the answer, "I can't remember," and the answer, "I won't say." The dissent finds the necessary inconsistency in the lapse of memory that it balks at recognizing in the refusal to testify. With respect to the inconsistency inherent in the claimed loss of memory, the dissent reasons:

> At its core, nearly all testimony at any trial is memory testimony. When a witness says, "I saw [Jerry] Tyler shoot Jay Bias," this means, "I remember that [Jerry] Tyler shot Jay Bias." Therefore, if a witness says at a second trial, "I can't remember who shot Jay Bias," the two answers *are* inconsistent. (Footnote omitted.) (Emphasis in original.)

By parity of reasoning, we see the same inconsistency in the refusal to testify. When the witness at his own trial said, "I saw Jerry Tyler shoot Jay Bias," that meant, "I will testify that Jerry Tyler shot Jay Bias." Therefore, if the witness says at a second trial, "I won't testify that Jerry Tyler shot Jay Bias," the two answers are similarly inconsistent.

In terms of the availability of the out-of-court declarant for cross-examination, we see no difference between this case and *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The sixteen-year-old juvenile, Melvin Porter, was neither more nor less available for cross-examination by the defendant in that case than was Gerald Eiland in this case. Although the Supreme Court majority found it unnecessary to decide the admissibility of Melvin Porter's out-of-court declaration given to the police, Justice Harlan, in his concurring opinion, squarely addressed the issue and was of the opinion that the witness's essentially total failure of memory did not render him unavailable for cross-examination. As discussed more fully *supra, United States v. Owens*, 484 U.S. 554, 108

S.Ct. 838, 98 L.Ed.2d 951 (1988), adopted Justice Harlan's concurring opinion in *California v. Green.* The majority opinion of Justice Scalia first noted:

> Justice Harlan, in a scholarly concurrence, stated that he would have reached the issue of the out-of-court statement and would have held that *a witness's inability to "recall either the underlying events that are the subject of an extrajudicial statement or previous testimony or recollect the circumstances under which the statement was given,* does not have Sixth Amendment consequence." (Emphasis supplied.)

484 U.S. at 558, 108 S.Ct. at 842. The *Owens* majority then placed its *imprimatur* on Justice Harlan's concurring opinion:

> Here that question is squarely presented, and *we agree with the answer suggested 18 years ago by Justice Harlan.* "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (Emphasis supplied.) (Emphasis in original.)

484 U.S. at 559, 108 S.Ct. at 842. What substantively can be extracted from a witness is the same regardless of whether the witness consistently answers, "I can't remember," or answers "I can't say."

At the most fundamental level, *Nance* was a policy response to the recognized and recurring problem of the "turncoat witness." When *Nance* used the phrase "turncoat witness," there is no disguising the fact that the adjective "turncoat" was used in a starkly pejorative sense. Permeating the opinion was the sense that a witness's claimed loss of memory was frequently feigned rather than genuine. In no uncertain terms, *Nance*'s response was that a wilfully uncooperative witness was not going to be allowed to thwart the trial process by feigning a loss of memory.

It would undercut the strategic purpose behind the *Nance* opinion for us now to permit an obstructionist witness, by altering his modality of non-cooperation ever so slightly, to

commit the very testimonial sabotage that *Nance* was designed to prevent.

We feel compelled to make one other response to the dissenting opinion. It properly characterizes a prior inconsistent statement of a witness offered for its substantive content as hearsay. It properly points out that a hearsay statement, to be admissible, must bear adequate indicia of reliability. It points out further that hearsay is deemed to be reliable if it is based upon a "firmly rooted" hearsay exception, but that the prior statement in issue here is not a firmly rooted exception. The dissenting opinion then concludes that if the hearsay is not a "firmly rooted" exception, it may only be deemed admissible if it has "particularized guarantees of trustworthiness," quoting *Nance v. State,* 331 Md. at 560, 629 A.2d 633. It goes on to conclude that the out-of-court statement here in issue lacks such "particularized guarantees of trustworthiness."

What the dissent overlooks is that Md. Rule 5–802.1(a), codifying *Nance v. State,* spells out explicitly what those "particularized guarantees of trustworthiness" shall be in the case of a turncoat witness. Those express guarantees are that the statement be one:

> (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement.

Even if the out-of-court statement here in issue were, as the dissent characterizes it, self-serving, it nonetheless expressly passed muster in terms of its trustworthiness by satisfying both the first condition and the third condition spelled out by the Maryland Rule and by *Nance v. State.* Putting aside any quarrel the dissent may have with whether the threshold conditions of *Nance* and the Maryland Rule were satisfied, its distinct quarrel with the ultimate reliability of the prior statement is fraught with dire implications. Although it may

continue to insist that the prior statement was unreliable, it cannot dispute the fact that the statement satisfied fully the only guidelines spelled out by both *Nance* and the Maryland Rule. If the dissent were correct, therefore, in its assertion that earlier trial testimony, such as that in this case, lacks particularized guarantees of trustworthiness, it would amount to a declaration that the decision of the Court of Appeals in *Nance v. State* and Md.Rule 5–802.1(a) are both unconstitutional under the Confrontation Clause of the Sixth Amendment. We do not agree that that is the case.

The dissenting opinion also relies heavily on the Supreme Court decision of *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), which we find to be completely inapposite. In *Douglas,* a witness invoked the privilege against compelled self-incrimination. The invocation of the privilege was apparently proper although the *Douglas* decision does not hinge on that fact. The prosecutorial tactic which the Supreme Court condemned was the reading of an earlier statement given by the witness, sentence-by-sentence, followed intermittently by the question, "Did you make that statement?" The modality for revealing the substance of the statement to the jury consisted exclusively of the prosecutor's questions, which modality the Supreme Court condemned as being "under the guise of cross-examination to refresh Lloyd's recollection." 380 U.S. at 416, 85 S.Ct. at 1075.

By contrast, there was no such subterfuge in the present case. Eiland's earlier sworn testimony at his separate trial was formally and overtly offered and received for its substantive content. There was no subterfuge employed. In the present case, moreover, there is no hint of impropriety in asking questions of one who improperly refuses to answer. As the post-*Douglas* cases of *United States v. Hearst,* 563 F.2d 1331 (9th Cir.1977), and *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978), make clear, there is a critical distinction between the impermissible continued questioning of one who *properly* invokes the privilege against compelled self-incrimination and the perfectly permissible continued ques-

tioning of one who *improperly* invokes the privilege or otherwise refuses to answer.

### An Alternative Rationale

As we acknowledged at the very outset of this opinion, our overriding purpose is, in the spirit of *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993), to prevent an undisputed "turncoat" from manipulating and impeding the processes of criminal justice. As we further acknowledged, our approach would be to take the basic principles and axioms announced by *Nance* and then, construing *Nance* liberally to serve its salutary purpose, to "push out the envelope" to explore the limits of *Nance*'s logic. We think we have done so plausibly. For the benefit, however, of those who might be timorous at probing the outer limits of a principle's logic, we offer an alternative and more modest rationale which does, in our judgment, also serve to sustain the conviction in this case.

The dispute over the admission of Eiland's earlier trial testimony, when reduced to its essence, is not a dispute involving the great bulk of that testimony at all, but only one concerning a very small, albeit critically important, fragment of it. That changes the focus of our analysis as we zero in on the only part of the disputed trial transcript that really matters. The rest is dross. Eiland's trial testimony, to be sure, consisted of a full narrative account of all of the events of the afternoon of December 4, 1990, leading up to the shooting of Jay Bias. Almost all of that testimony was, when introduced at the appellant's trial, redundant, cumulative, and undisputed. What Eiland had to say about the preliminary confrontation at the Prince George's Plaza Mall, about the drive that he and Tyler made across the parking lot in the Mercedes driven by Eiland, and about pulling up in the adjacent lane beside the Toyota occupied by Jay Bias, Andre Campbell, and Tydus Mathis, was indistinguishable from the sworn trial testimony given by the appellant Tyler himself. It matched, moreover, in every significant detail the testimony of Andre Campbell and Tydus Mathis. It added nothing to the State's case.

The accounts of Eiland and of Tyler only diverged when they came to the last split second before the shooting. Each claimed total surprise when the other unexpectedly opened fire at the Toyota. It was only on this question of *identifying who fired the murder weapon* that Andre Campbell and Tydus Mathis were of little help, because they had both ducked down a split second before the gun was fired. Shorn, therefore, of its insignificant detail, Eiland's testimony from his own trial, when offered at the appellant's trial, established only one critical fact—*the identification of the shooter.* Campbell, Mathis, and the appellant Tyler himself had already established the fact that the universe of eligible gunmen consisted of only two candidates, the appellant Tyler himself and Eiland. The nub of the case was the identification of the criminal agent.

What the transcript from the earlier trial actually represented, as a content-neutral algebraic term, was third-party evidence of a pretrial (extrajudicial) identification. Eiland had been a witness to a shooting. He was able to identify the shooter. In a pretrial (extrajudicial) setting (meaning some forum other than and prior to the trial of this case), he identified the shooter. The modality of the identification was by naming Tyler rather than by pointing a finger at him or at his photograph, but that is a distinction without a difference. He knew Tyler by name and a selection process was unnecessary to the identification.

Eiland was, moreover, present in the courtroom at the appellant's trial and available to be called as a witness by the appellant, had the appellant chosen to do so. The third-party witness to Eiland's pretrial identification of the appellant was, instead of the policeman who is most often cast in the role, the court reporter from the earlier trial or the trial transcript itself. With only these inconsequential differences from the more garden-variety or paradigmatic identification scenario, the evidence in issue was, when reduced to algebraic terms, evidence of a pretrial identification. A single event may be viewed through many prisms, but however else we may char-

acterize what he did, Eiland had identified the gunman as Tyler.

For the law controlling the admissibility of evidence of a pretrial identification, offered as substantive proof of guilt, we turn to *Nance v. State.* *Nance* is not a monolithic opinion dealing with a single evidentiary phenomenon. It deals, rather, with three partially related but distinct evidentiary phenomena. It analyzes each separately: 1) extrajudicial identifications, 331 Md. at 560–64, 629 A.2d 633, 2) prior inconsistent and written statements given to the police, 331 Md. at 564–69, 629 A.2d 633, and 3) prior inconsistent statements given to a grand jury or in some other formal procedure, 331 Md. at 569–71, 629 A.2d 633. Though partially overlapping, the guidelines established by *Nance* for the admissibility of these respective types of evidence are distinct.

The unusual aspect about the evidence of pretrial identification now before us is that it is subject to analysis in more than one way—either as an instance of *Nance*'s first evidentiary phenomenon, a pretrial identification; or as an instance of *Nance*'s third evidentiary phenomenon, prior sworn testimony. Because the guidelines for admissibility are different for those respective evidentiary phenomena, the evidence in issue might arguably qualify under one framework of analysis even if it fails to qualify under another.

A critical difference between the two frameworks of analysis is that Eiland's pretrial behavior, viewed as prior testimony, would require a conclusion that at the appellant's trial Eiland have given testimony inconsistent with his earlier pretrial declaration; Eiland's pretrial behavior, viewed as evidence of an extrajudicial identification of the shooter as Tyler, by contrast, would encounter no such requirement of inconsistency.

*Nance* is clear that evidence of an extrajudicial identification is admissible as long as the out-of-court declarant is present at trial and subject to cross-examination. No present testimony at all, let alone inconsistent present testimony, is required.

Such evidence is not only admissible but is sufficient, in and of itself, to sustain a conviction:

It is well settled in Maryland that a court may admit, as substantive proof, evidence of a third party testifying as to an extrajudicial identification by an eyewitness when made under circumstances precluding the suspicion of unfairness or unreliability, where the out-of-court declarant is present at trial and subject to cross examination. An extrajudicial identification is sufficient evidence of criminal agency to sustain a conviction, even though the declarant is unable to identify the accused at trial. (Citations omitted).

331 Md. at 560–61, 629 A.2d 633.

*Nance* speaks of "[a]mple authority support[ing] the admission of an extrajudicial identification even where the witness recants at trial." 331 Md. at 562, 629 A.2d 633. It cites with approval *United States v. Elemy,* 656 F.2d 507, 508 (9th Cir.1981) (Rule enacted to remedy problem where before trial witness identifies the defendant and then, because of fear, refuses to acknowledge his previous identification) and *People v. Malone,* 193 Mich.App. 366, 483 N.W.2d 470, 471–72 (1992) (Extrajudicial identification admitted substantively even though witness refused to acknowledge it at trial). *See also United States v. Marchand,* 564 F.2d 983, 996, (2d Cir.1977); *United States v. O'Malley,* 796 F.2d 891, 898–99 (7th Cir.1986).

How far does the fact of identification go? An extrajudicial identification, by its very nature, inevitably has some substantive content. The witness does not identify the culprit simply as "a human being" or as "someone he had seen before." Such evidence would be meaningless. The act of identification labels the person identified as the criminal agent in the case under investigation. In *Nance,* what was found to be admissible were the extrajudicial identifications by two witnesses, *identifying the defendants Nance and Hardy "as those responsible for Aaron Carroll's murder."* 331 Md. at 564, 629 A.2d 633. In *Basoff v. State,* 208 Md. 643, 119 A.2d 917 (1956), the admissible evidence of the extrajudicial identification was that an abortion victim *identified the defendant as the abor-*

*tionist.* In *Judy v. State,* 218 Md. 168, 146 A.2d 29 (1958), the admissible evidence of the extrajudicial *identification was of the defendant as the criminal agent who attempted to commit an armed robbery.* In *Proctor v. State,* 223 Md. 394, 164 A.2d 708 (1960), the admissible evidence of the pretrial *identification was also of the defendant as one who assaulted the victim with intent to rob.* In *Johnson v. State,* 237 Md. 283, 206 A.2d 138 (1965), the evidence of extrajudicial identifications was that by two victims who *identified the three defendants as the armed robbers in that trial for armed robbery.*

To counter the possible arguments that the identification of the other man in the car with Eiland was not in dispute and that the word "identification," as a term of art, refers only to the procedural exercise of selecting one person, on the basis of physical appearance, from a group of possibilities, we refer again to *Nance.* In *Nance,* the "identification" in issue did not involve the classical weighing of reliability factors versus the risk of misidentification as in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), or *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). It was the simple naming, by the two witnesses to a murder, of two known persons as the murderers. That the word "identification" connotes more than a mere selection process was made clear by *Nance:*

> Harris and McCormick twice repeated their *identifications,* once in signed statements and once under oath in a proceeding before the grand jury. (Emphasis supplied.)

331 Md. at 563, 629 A.2d 633. The signed statements and the grand jury testimony involved, as the modality of identification, only the *naming* of *Nance* and *Hardy,* and not the selecting of them or their photographs from a group. On the basis of extensive case law, in Maryland and elsewhere, these "identifications" were properly received as substantive evidence:

> Viewing these facts in light of the cases from Maryland and other jurisdictions cited above, we conclude that the trial court properly admitted, as substantive evidence of guilt, *the*

*out-of-court identifications of Petitioners as those responsi-
ble for Aaron Carroll's murder.* (Emphasis supplied.)

331 Md. at 564, 629 A.2d 633.

An identification, moreover, may be made in a courtroom as
readily as in a police station. Cited with approval by *Nance,*
331 Md. at 563, 629 A.2d 633, was the opinion of the Supreme
Court of California in *People v. Lucky,* 45 Cal.3d 259, 247
Cal.Rptr. 1, 753 P.2d 1052 (1988). In that case, a critical
factor was that the identifying witness, as in this case, reiter-
ated (or iterated) the identification under oath at a judicial
proceeding. As *Nance* summarized the California holding:

> The California court held that a repudiated identification
> may form the basis for conviction if it was *reiterated by the
> witness under oath at a* preliminary examination or other
> *judicial proceeding,* and there was evidence from which the
> factfinder could credit the witness's prior testimony over his
> or her failure to confirm the extrajudicial statements at
> trial. (Emphasis supplied.)

331 Md. at 563, 629 A.2d 633.

Much of the case law explaining why an extrajudicial identi-
fication is, subject to certain conditions, admissible as substan-
tive evidence stresses the self-evident truism that memory is
fresher at an earlier time than at the later trial, and that the
earlier identification, perforce, is more likely to be reliable
than the later. That rationale, of course, is inapposite to the
present case. There is, however, an additional rationale for
admissibility, that *is* here pertinent. *Nance* quoted with
approval, 331 Md. at 562–63, 629 A.2d 633, from the opinion of
the Supreme Court of Virginia in *Niblett v. Commonwealth,*
217 Va. 76, 225 S.E.2d 391, 394 (1976):

> [T]he memory of a witness may fade.... It is also not
> beyond the realm of possibility that an identifying witness
> may be inhibited by threat or intimidation from making a
> positive in-court identification.

*Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982), one of the
primary authorities on which *Nance* relied, also recognized

this additional rationale. *Nance* fleshed out more fully what *Bedford* had suggested:

> This Court in *Bedford, supra,* 293 Md. at 178, 443 A.2d 78, also implicitly recognized *the possibility of witness intimidation:* "The failure may be explained by loss of memory or other circumstances." *Among such other circumstances are threats and fear of retaliation.* (Emphasis supplied.)

*Bedford v. State* established indisputably that later inconsistent trial testimony is not a prerequisite to the admissibility of a pre-trail identification. An elderly couple, aged eighty and seventy-seven, were the victims of a daytime housebreaking of their home and of armed robbery at hatchet point. Each, independently, selected a photograph of Bedford as a picture of "the individual who had robbed them," 293 Md. at 174, 443 A.2d 78. Having earlier failed to identify Bedford at a pre-trial hearing, neither victim was even asked to attempt an identification at trial. The subject of identification was not raised in the trial testimony of the victims and there was no theoretical possibility of an inconsistency between their trial performances and their pre-trial performances.

The testimony of a policeman that each victim had on an earlier occasion selected a photograph of Bedford *and indicated that he was the robber* was the only evidence in the case bearing on Bedford's criminal agency. Not only was the evidence admissible; it was sufficient, standing alone, to support the verdicts of guilty for daytime housebreaking and for two armed robberies. The Court of Appeals, 293 Md. at 176–77, 443 A.2d 78, quoted with approval from *Johnson v. State,* 237 Md. 283, 291, 206 A.2d 138 (1965):

> We hold therefore that where, as here, the identifying victims or eyewitnesses were present and subject to cross-examination, the testimony of the police officer as to the extrajudicial identifications was admissible.
>
> Even where witnesses do not make a courtroom identification of the indictees, an extrajudicial identification is admissible as evidence over an objection that it is not the best evidence.

The *Bedford* opinion also quoted, with approval, the Supreme Judicial Court of Massachusetts in *Commonwealth v. Torres*, 367 Mass. 737, 739, 327 N.E.2d 871 (1975):

Even if the witness does not identify the defendant in his or her testimony at trial, any pre-trial identification of the defendant by that witness in constitutionally proper circumstances should be given probative value. *See Clemons v. United States*, 408 F.2d 1230, 1242–1243 (D.C.Cir.1968), *cert. den.* 394 U.S. 964 [89 S.Ct. 1318, 22 L.Ed.2d 567] (1969); Wigmore, *Evidence* (Chadbourn rev.) § 1130 (1972). Although the probative value of any evidence of such identification is for the jury, that evidence, if believed, tends to prove that the defendant was the perpetrator of the crime. The trend of decisions is to permit such evidence to be introduced.

*Bedford's* holding was clear:

We hold that an extrajudicial photographic identification of an accused is sufficient evidence of his criminal agency to support a conviction, notwithstanding the fact that the victim may be unable to identify him at the time of trial.

293 Md. at 185, 443 A.2d 78.

A witness (Eiland) to the murder of Jay Bias made a pre-trial (at his own earlier trial) identification of the murderer as the appellant Tyler. As long as Eiland was available to be called as a witness by the appellant, a third-party (court reporter, trial transcript, etc.) would be permitted, under the authority of *Nance* and *Bedford,* to testify as to that earlier identification as substantive evidence of the appellant's guilt. This would be true whether Eiland 1) took the stand and confirmed his earlier identification of Tyler, 2) took the stand and repudiated that earlier identification, 3) took the stand and denied ever having made the earlier identification, 4) took the stand and claimed a loss of memory as to the shooting, 5) took the stand and refused to discuss the identification of the gunman, or 6) was not even called to the stand.

### Our Holding

Under review is the discretionary evidentiary ruling that the hearsay be admitted. Utilizing, as we have done, two separate aspects of *Nance v. State* and two respective frameworks of analysis, we hold that there was no clear abuse of discretion.

### *"The Light That Failed"*

The appellant complains generally, without reciting any particular doctrinal basis, about the 18–day postponement in the effort to compel Eiland to testify. Our earlier discussion subsumes this issue. Judge Ahalt used every device available to him to obtain the live testimony of Eiland. Far from doing anything to place the appellant at a disadvantage, Judge Ahalt extended himself to avoid the very hearsay problem of which the appellant now complains. It is unnecessary to add that the appellant has not even alleged any resulting prejudice.

### *The Legal Sufficiency of the Evidence*

At the express direction of the appellant, it is urged that the evidence was not legally sufficient to have permitted Judge Ahalt to submit the case to the jury. We do not agree. Several witnesses testified to the argument that took place between Tyler and Jay Bias when Tyler believed that Bias had been flirting with Tyler's wife, Shaunelle, as she was working at Kay Jewelers in the Prince George's Plaza Mall. As the two argued, Tyler was heard to threaten to "cap" Jay Bias.

Two passengers in the vehicle wherein Bias was killed testified that as they were driving from the parking lot of the mall, the Mercedes containing Tyler and Eiland came racing up beside them at a rapid speed. Although neither could say which of the two occupants of the Mercedes fired the lethal shots, they could testify that Eiland was the driver and that Tyler was in the passenger seat. They saw Tyler, moreover, "reaching down towards his leg on the right side" just before the shots were fired. The prior testimony of Eiland that was received in evidence stated unequivocally that Tyler was the

shooter. The evidence was abundant to have permitted the jury to conclude beyond a reasonable doubt that Tyler was guilty as charged.

### The Aiding and Abetting Instruction

Tyler objected to the jury's having been instructed that Tyler could be convicted as an aider and abetter even if the jury did not believe that he was the shooter. He does not now argue that the instruction given was not an accurate statement of the law. Neither does he argue that, in the abstract, it was not supported by the evidence in the case.

■ He makes, rather, two bald assertions to the effect that the State was estopped from relying on a theory of guilt based on aiding and abetting. He asserts that the State, in opening statement to the jury, conceded that Tyler was not an aider and abetter. That is hardly the case. The State was recounting for the jury its expectation that the evidence would show that Tyler was the actual gunman. Even if the jury had believed Tyler's testimony that it was Eiland, and not he, who fired the fatal shots, the jury would not have been precluded from convicting Tyler as an aider and abetter. The State's expectation, articulated in opening statement, that it could prove a greater level of blameworthiness would not preclude the appellant's being convicted at a lesser level of blameworthiness, should the jury find partially in his favor. In *White v. State*, 11 Md.App. 423, 430, 274 A.2d 671 (1971), we explained the non-binding effect of an opening statement in a criminal case:

> Maryland is clearly in line with this majority position that the office of "an opening statement in a criminal prosecution is to apprise, with reasonable succinctness, the trier of facts with the questions involved and what the State or defense expects to prove, so as to prepare said trier of the facts for the evidence to be adduced ... and it generally has no binding force or effect." *Clarke v. State*, 238 Md. 11, 19–20 [207 A.2d 456 (1965) ].

■ The appellant's second estoppel theory seems to be based in collateral estoppel, though he never mentions the phrase. Defense counsel represented to Judge Ahalt that at the first trial of Tyler and Eiland together, it was Eiland who was convicted of having been the aider and abetter. The actual verdict against Eiland, however, was simply that he was guilty of murder in the second degree.

Even if it were otherwise, however, the verdicts of guilty against both defendants were reversed and hardly represented, therefore, "a valid final judgment." *Butler v. State,* 335 Md. 238, 253, 643 A.2d 389 (1994). There is the further impediment that collateral estoppel requires a material finding of fact "in one's favor." Any decision at the first trial to the effect that Eiland was the less guilty of the two and that Tyler, therefore, by a process of elimination was the more guilty of the two, was hardly a finding in Tyler's favor. The appellant is, in effect, arguing that, once having been found guilty of murder in the first degree, collateral estoppel would bar him, following reversal and remand, from ever being found guilty of murder only in the second degree.

Since the appellant is invoking, moreover, an allegedly preclusive effect of the verdict in his own (and Eiland's) first trial for the very same offense, it is not, by definition, an occasion for collateral estoppel analysis. In any event, we are not going to try to construct either a collateral estoppel argument or a direct *res judicata* argument, even for the purpose of then refuting it, on the appellant's behalf that he has not even partially made for himself.

### *The Plaintive Cry of "Plain Error"*

■ We may consider the appellant's fifth and sixth contentions together for the same overarching, if sometimes neglected, principle of appellate review is dispositive of both. In his fifth contention, the appellant claims that Judge Ahalt committed plain error in instructing the jury on first-degree murder. In his sixth contention, the appellant claims that Judge Ahalt committed plain error in not instructing the jury that its

verdict must be unanimous. We have no idea whether there is substantive merit in either contention and we are not about to take the time or trouble to find out for the obvious reason that no objection was made to either instruction. There is, therefore, nothing preserved for appellate review. Md. Rule 4–325(e).

The appellant asks us to exercise our discretion by way of noticing "plain error." We decline. The rule is that an objection, to be considered on appeal, must be preserved. We admonish the defense bar that we are not about to allow the exception to swallow the rule.

### The Relevance of a Motive

Tyler objects to the fact that Michael McCutchen, the manager of Kay Jewelers, was permitted to testify that, as he was ejecting Tyler from the jewelry store following Tyler's outburst of anger toward his wife, Shaunelle, Tyler was heard to say that "he was willing to go back to jail over the situation." Tyler objects on the ground that this testimony was irrelevant.

Far from it. Whenever a murder occurs, the instinctive question on everyone's lips, detective and juror alike, is, "Who had a motive?" Tyler's outburst of jealous anger over Jay Bias's perceived or imagined attention to Shaunelle was the clear and undisputed motive for the murder of Jay Bias a few minutes thereafter. Michael McCutchen's testimony helped to establish the high level of that jealous anger.

The appellant seems to be operating under the assumption that the relevance must be established by McCutchen's testimony alone. That is not the case. The establishing of the jealous anger came from the combined testimony of McCutchen, Tydus Mathis, and Andre Campbell. Jay Bias and Campbell were just leaving Kay Jewelers when Tyler walked in. Tyler apparently believed that Shaunelle had been flirting with Bias. A turbulent argument ensued between Tyler and Shaunelle, culminating in Tyler's hurling a stapler at her. It was at that point that the manager, Michael McCutchen,

intervened and directed Tyler to leave the store. It was as he was leaving that Tyler vented that "he was willing to go back to jail over the situation."

Immediately outside the store, the first confrontation occurred between Tyler and Jay Bias. The subject matter of the confrontation was indisputably Shaunelle. Tyler challenged Bias to "come on outside, we can take care of this outside." Their respective friends broke up that immediate confrontation, but Campbell remembered, as he and Bias were leaving the scene, a voice saying "I will cap you."

The testimony in issue was an integral part of the episode that supplied the motive for the killing. The testimony was properly ruled to be admissible.

### *Evidentiary Irrelevance*

Tyler's final contention is that Judge Ahalt erroneously refused to permit Tyler's mother, Yvonne Tyler, to answer the question, "During the entire time that he has been your son, have you ever known him to carry a weapon?" Although the appellant has failed to proffer what the mother's answer would have been, we will on this occasion give him the benefit of the doubt and assume that his mother's answer would have been that she had not known her son to carry a gun.

Although there may be a number of reasons why the answer sought to be elicited might properly be ruled to be irrelevant, it suffices to point out that no proper foundation was laid for the mother's testimony. Tyler had been living with his wife, Shaunelle, for at least three years. She was permitted to testify that during those three years, Tyler had not possessed a gun. There was no foundation laid as to the degree of contact between Tyler and his mother or the basis for the mother's knowledge that he did not carry a gun, if that indeed would have been her answer.

In any event, recognizing the wide discretion vested in the trial judge to rule on such evidentiary matters as relevance, we see no abuse of discretion in this case.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.*

MURPHY, Judge, concurring.

I concur in the judgment and would not change one word in the majority's analysis of every issue except the admissibility of Eiland's testimony. I would, however, add the following reasons why (1) Eiland's testimony at his trial was inconsistent with his refusal to answer any questions in this case, and (2) the introduction of Eiland's prior testimony did not violate appellant's right of confrontation.

An assertion may be express or implied. There is evidentiary significance in an implied assertion. *In re Devon T.,* 85 Md.App. 674, 696–697, 584 A.2d 1287 (1991). In this case, we have Eiland's express assertion, "I cannot answer." When Eiland testified at his trial, he made the implied assertion, "I can answer." Those conflicting assertions establish the inconsistency required to trigger the *Nance* exception to the rule against hearsay.[1]

The confrontation clause guarantees only an opportunity for effective cross-examination. *Pennsylvania v. Ritchie,* 480 U.S. 39, 53, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987). The trial judge did not prohibit either side from questioning Eiland. We must assume that Eiland's response to each question would have been "I can't answer." There is, however, no constitutional right to a truthful answer.

There may be cases in which the right of confrontation is violated because a witness—hearsay declarant contumaciously

---

1. I do not agree with the proposition that any concessions made by the State during reargument prohibit our reliance on the theory of admissibility set forth in this opinion. We are not required to accept the State's concession that an appellant is entitled to a new trial. *Moten v. State,* 100 Md.App. 115, 118, 640 A.2d 222 (1994), *cert. granted,* 336 Md. 405, 648 A.2d 991 (1994). We should not reverse a conviction merely because, during argument or reargument, the State appears to abandon a correct theory of admissibility in favor of an incorrect one. Trial judges—and intermediate appellate courts—can be right for the wrong reason. *State v. Breeden,* 333 Md. 212, 227 n. 5, 634 A.2d 464 (1993).

refuses to answer the defendant's questions. Whether the confrontation clause was violated, however, depends on the importance of both the question and the answer. *How* a witness—declarant reacts to the question is always of consequence to the assessment of that person's credibility. If *what* the witness—declarant would answer is of no consequence whatsoever, the confrontation clause is satisfied when the defendant has the opportunity to ask questions of the contumacious witness—declarant in the presence of the jury.

In this case, the right of confrontation was satisfied when appellant was permitted to question Eiland in the presence of the jury. The jurors were in position to observe Eiland's demeanor as he reacted to the questions. Through able counsel, appellant had a full and fair opportunity to ask questions in support of his argument that Eiland's prior testimony was as worthless as his "I can't answer" responses. Such an opportunity is all that the confrontation clause guarantees.

WILNER, Chief Judge, dissenting in which BLOOM, J., joins.

For the reasons so well stated by Judge Moylan in his majority Opinion, this is a "hard case." We must be careful, however, that we do not allow a hard case to make bad law. I cannot join the majority because I believe that it is stretching the law in an unwarranted manner—in a manner that will affect thousands of other cases—simply to avoid what it perceives to be an unfairness to society in this one case. I write separately not because I necessarily disagree with Judge Salmon's dissent, but because I do not believe it necessary to reach the Constitutional issue or the issue of whether Eiland was "available" or "unavailable" as a witness.

This appeal was reargued *en banc* in order to give the parties an opportunity to explain their theories and explicate the facts underlying those theories to the entire Court. The reargument served to clarify, and greatly narrow, the competing positions. The State conceded that Eiland's refusal to

answer questions put to him at Tyler's trial was not based on any actual inability, physical or mental, to answer the questions, but represented simply his unwillingness to answer those questions. That concession is a legitimate one. It is the only reasonable inference that can be drawn from the record and was the necessary underpinning for the court's finding of contempt.

The State also acknowledged that Eiland's recorded trial testimony was not evidentially inconsistent with anything he said at Tyler's trial. That acknowledgement necessarily served to withdraw or negate any contention that the earlier testimony was admissible because of its quality as a prior inconsistent statement. These two concessions effectively destroy the major premise for Judge Murphy's concurring opinion.

On the basic hearsay level, the State's position now rests entirely on the view that *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993), should be read to permit a prior recorded statement of a witness to be admitted as substantive evidence even if that statement is not inconsistent with the witness's trial testimony.

I do not read *Nance* as supporting that position; nor can I find any other applicable hearsay exception, at least under the circumstances of this case. For that reason, I would declare the recorded statement inadmissible under the State hearsay rule and not reach the confrontation issue or the question of whether Eiland was available or unavailable at Tyler's trial.

No one even suggests that Eiland's recorded trial testimony was not hearsay. It was, in the words of Md. Rule 5–801(c), "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." To be admissible, therefore, it must fall within at least one of the recognized exceptions to the hearsay rule. The statement was not offered, and its admissibility cannot be justified, under any of the express exceptions formerly recognized as part of Maryland common law that are now contained in Md. Rules 5–803 or 5–804. Nor

can it be regarded as admissible under the "catchall" exceptions stated in Rule 5–803(b)(24) or 5–804(b)(5). Assuming that those broad exceptions existed at common law, the court made none of the requisite findings sufficient to justify admission under those provisions.

As noted, the State seeks to sustain admission of the statement solely upon an expanded reading of *Nance.*

*Nance* addressed the problem of three witnesses who (1) prior to trial, had made photographic identifications of Nance as one of the persons who shot the victim, (2) also prior to trial had given written statements to the police and testimony to a grand jury naming Nance as one of the killers and describing the circumstances surrounding the shooting, but (3) at Nance's trial, repudiated both the identifications and the recorded statements.

The Court of Appeals treated the identifications and the broader pretrial statements separately. With respect to the pretrial identifications, the Court relied on cases such as *Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982), and held:

> "It is well settled in Maryland that a court may admit, as substantive proof, evidence of a third party testifying as to an extrajudicial identification by an eyewitness when made under circumstances precluding the suspicion of unfairness or unreliability, where the out-of-court declarant is present at trial and subject to cross-examination. [citations omitted] An extrajudicial identification is sufficient evidence of criminal agency to sustain a conviction, even though the declarant is unable to identify the accused at trial."

331 Md. at 560–61, 629 A.2d 633.

In *Bedford,* the defendant was charged with the armed robbery of two elderly victims. The victims provided a description of their assailant, assisted the police in preparing a composite picture, and subsequently made a photographic identification of the defendant Bedford. At a later suppression hearing, however, they were unable to make an identification, and, as a result, they were not even asked to identify Bedford at trial. The pre-trial photographic identification was

admitted into evidence in default of such testimony and apparently formed the principal basis of Bedford's conviction. The issue before the Court of Appeals was whether the conviction could rest on that pre-trial identification, in light of the victims' inability to make a judicial identification. Implicit in that issue was the assumption that the pre-trial identification was admissible as substantive evidence.

*Bedford*, as confirmed in *Nance*, is instructive in two interrelated respects. The first has to do with reliability. The extrajudicial identification was ruled admissible as substantive evidence and declared sufficient to sustain the conviction because (1) it was made under circumstances "precluding the suspicion of unfairness or unreliability," and (2) notwithstanding their later inability to make an identification, the witnesses were in court and subject to cross-examination. The second point of interest is that, in *Bedford*, though not in *Nance*, the presumed admissibility of the pre-trial identification did not depend on any recantation by the witnesses or on the pre-trial identification being inconsistent with any testimony given at trial. There was, in fact, no recantation or inconsistency in *Bedford*. The pre-trial assertion was admitted on much the same basis as a past recollection recorded, and, indeed, both situations are now treated together in Md. Rule 5–802.1.

In this regard, Rule 5–802.1(c) essentially codifies the *Nance* and *Bedford* holdings. It provides, in relevant part, that a statement that is one of identification of a person made after perceiving the person is not excluded by the hearsay rule if the declarant is a witness who testifies at trial and is subject to cross-examination concerning the statement. Implicit in the rule, though not expressly stated in the text, is the prerequisite that the identification be made under circumstances precluding the suspicion of unfairness or unreliability. That gloss is necessarily imposed by Rule 5–403, allowing the exclusion of otherwise admissible evidence if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice.

The second aspect of *Nance* concerned the written statements made by the three witnesses to the police and, eventually, to the grand jury. Those statements, the Court noted, "were repudiated at trial." 331 Md. at 564, 629 A.2d 633. In most instances, the repudiation was clear and direct. The issue was whether Maryland would continue to adhere to what had become a minority view that such inconsistent statements were admissible only for impeachment purposes. The entire discussion by the Court was in the context of prior *inconsistent* statements, as was its ultimate holding. At 569, 629 A.2d 633, the Court stated its conclusion thusly:

"We hold that the factual portion of *an inconsistent out-of-court statement* is sufficiently trustworthy to be offered as substantive evidence of guilt when the statement is based on the declarant's own knowledge of the facts, is reduced to writing and signed or otherwise adopted by him, and he is subject to cross-examination at the trial where the prior statement is introduced."

That limitation is also explicit in Rule 5–802.1(a), which effectively codified the *Nance* holding.

The teaching of *Nance* and *Bedford,* as currently expressed in Rule 5–802.1 is this: To the extent that the prior out-of-court statement is simply one of identification, it need not be inconsistent with any testimony given by the declarant at trial, but it must have been made under circumstances negating any suspicion of unfairness or unreliability. To the extent the earlier statement concerns matters other than identification, it must be inconsistent with the declarant's trial testimony.

Regrettably, in this case, the State fares poorly in both aspects. To the extent that Eiland's own trial testimony constitutes an identification of Tyler as the actual killer, that testimony was certainly not given under circumstances precluding the suspicion of unreliability. Eiland was on trial for murder; in his first trial, he had been convicted of second degree murder and use of a handgun and had been sentenced to prison for 30 years. There was never much dispute that one or the other of them fired the fatal shots, so the only

reasonable hope that Eiland could possibly have of escaping another conviction was to place all of the blame on Tyler, which is what he succeeded in doing. The fact that his testimony was under oath hardly suffices to wash away that compelling incentive to accuse Tyler. The identification aspect of his trial testimony was therefore inadmissible because it was given under circumstances nine months pregnant with the suspicion of unreliability.

That same unreliability would doom the penumbral aspects of his testimony as well, but even if it did not, I can find no warrant whatever for extending the second holding of *Nance* to include non-inconsistent statements. There is nothing in *Nance* to suggest such an extension, and there is nothing in Rule 5–802.1 to suggest it. Indeed, were we to construe either *Nance* or the rule in such an extended manner, we would be creating a new, independent hearsay exception out of whole cloth, barely a year after the Court of Appeals, on the heels of a five-year effort by its Standing Committee on Rules of Practice and Procedure, comprehensively rewrote the law of evidence in this State. We would, in addition, be creating a very serious Constitutional confrontation issue, at least in criminal cases. Because the State has rightly acknowledged that there was no inconsistency here, those aspects of Eiland's trial testimony not relating to identification of Tyler were also inadmissible.

It is for these reasons that I dissent.

DAVIS, Judge, dissenting in which BLOOM, J., joins.

I dissent from that portion of this Court's opinion holding that the testimony given at Eiland's December 1993 trial was admissible against Tyler. I fully concur with the dissenting opinion of Judge Salmon. I write separately to articulate my particularized concern that the admission of Eiland's prior testimony violated Tyler's Sixth Amendment right to confrontation.

Commentators have long associated the Confrontation Clause with the notorious abuses at the trial of Sir Walter Raleigh in 1603. As one commentator explained:

> The chief evidence against Raleigh was a sworn statement of Lord Cobham, a statement made to royal commissioners who interrogated Cobham in the tower where he was jailed. The accusatory statement may have been coerced; its reliability was certainly undercut because Cobham retracted the statement and then recalled the retraction. Even though Raleigh demanded that Cobham be produced, Cobham was never called as a witness.

Roger W. Kirst, *The Procedural Dimension of the Confrontation Doctrine*, 66 NEB.L.REV. 485, 490 (1987). *See also* Graham C. Lily, *Notes on the Confrontation Clause and Ohio v. Roberts*, 36 U.FLA.L.REV. 207, 208–212 (1984). On the strength of Cobham's dubious statement, Raleigh was convicted of treason and executed.

Although the historical association between the Confrontation Clause and Raleigh's "trial by affidavit" may be little more than a romantic myth,[1] the story dramatically illustrates the abuses that once prevailed in English criminal trials:

> At the time of Raleigh's trial ... the depositions of absent persons were read as the usual course of evidence which had prevailed for centuries in State prosecutions; this mode of proof constituted the general rule, and the oral examination of witnesses was the exception, which was in practice sometimes allowed, but was as often refused, and never permitted but by the consent of counsel for the prosecution.

5 D. JARDINE, HISTORICAL CRIMINAL TRIALS 514 (1832). *See also* 5 JOHN H. WIGMORE, EVIDENCE § 1364, at 12–28 (Chadbourn Rev.1974) (discussing the history of the rule against hearsay).

At the outset, I think it essential to note that the prior testimony at issue here was presumptively unreliable. In

---

1. *See, e.g.*, Kenneth W. Graham, Jr., *The Right to Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One*, 8 CRIM.LAW BULL. 99, 100 n. 4 (1972); ALFREDO GARCIA, THE SIXTH AMENDMENT IN MODERN AMERICAN JURISPRUDENCE: A CRITICAL PERSPECTIVE 73 (1992).

*Douglas v. Alabama,* 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965), the Supreme Court held that a defendant's inability to cross-examine an accomplice, with regard to the accomplice's alleged confession, plainly denied the defendant his right of confrontation.

> This holding, on which the Court was unanimously agreed, was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, *the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination.*

*Lee v. Illinois,* 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986) (emphasis added). Over the years since *Douglas,* the Court "has spoken with one voice" in declaring that such statements are "presumptively unreliable." *Id.* See *also Wilson v. State,* 334 Md. 313, 334–35, 639 A.2d 125 (1994).

Prior to the decision in *Nance v. State,* 93 Md.App. 475, 613 A.2d 428, (1992), *aff'd,* 331 Md. 549, 629 A.2d 633 (1993), the prior testimony of a witness was not admissible as substantive evidence in Maryland, unless the declarant was unavailable and the statements were made at previous proceedings against the same defendant, wherein the accused had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. *See, e.g., State v. Breeden,* 333 Md. 212, 222, 634 A.2d 464 (1993); *Crawford v. State,* 282 Md. 210, 214–15, 383 A.2d 1097 (1978). *See also* MD. RULE 5–804(b)(1). The majority correctly observes that Eiland's testimony was not admissible under the exception for former testimony. Tyler had no opportunity to cross-examine Eiland during the December 1993 trial, and the State was not positioned to serve as Tyler's surrogate. Because the testimony at issue here was presumptively (and perhaps notoriously) unreliable, we should not be eager to conclude that Eiland was available for cross-examination. In the absence of a *meaningful* opportunity for effective cross-examination, the very nature of Eiland's prior testimony demands that it be excluded.

## I

I do not agree with the majority's conclusion that Eiland was "available" as required by the *Nance* exception to the rule against hearsay. *See Nance*, 331 Md. at 571, 629 A.2d 633 (holding that prior inconsistent testimony is not admissible unless the declarant is "present as a witness at trial to be tested by cross-examination"). Whether Eiland was "available" for the purposes of the Confrontation Clause, of course, is another matter entirely. The Supreme Court has recognized that hearsay rules and the Confrontation Clause are "designed to protect similar values," but the Court has "been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements." *Wilson*, 334 Md. at 322, 639 A.2d 125 (quoting *Idaho v. Wright*, 497 U.S. 805, 814, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990)). Properly understood, the Confrontation Clause is neither "a minor adjunct of evidence law," nor "a mere vestigial appendix of the hearsay doctrine." Randolph N. Jonakait, *Restoring the Confrontation Clause to the Sixth Amendment*, 35 UCLA L.REV. 557, 575, 622 (1988). Even if Eiland was sufficiently "available" to satisfy the mandates of *Nance*, the Confrontation Clause may require that his prior testimony be excluded.

Although the Supreme Court has often noted that the Confrontation Clause was intended to advance "the accuracy of the truth-determining process in criminal trials," *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970), the fundamental purpose of the right to confrontation runs much deeper. In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Court explained:

> The Sixth Amendment includes a compact statement of the rights necessary to a full defense.... [T]hese rights are basic to our adversary system of criminal justice.... The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice.

*Id.* at 818, 95 S.Ct. at 2532–33. In other words, "[t]he right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails." *Lee,* 476 U.S. at 540, 106 S.Ct. at 2062. *See also Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) (noting that a fair trial requires an "adversarial testing" of the State's evidence).

The right to a fundamentally fair trial requires that the accused be permitted to press a full, vigorous, and adversarial defense. As one commentator has noted, "[T]he adversary system's real genius . . . lies in the use and perfection of cross-examination." Richard G. Singer, *Forensic Misconduct by Federal Prosecutors—And How It Grew,* 20 ALA.L.REV. 227, 268 (1968). *See also* MODEL CODE OF EVIDENCE ch. VI, introductory note (1942) (the opportunity for cross-examination "is the very heart of an adversary theory of litigation"). Accordingly, both courts and commentators have concluded that "[t]he main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.*" 5 WIGMORE § 1395, at 150. *See also Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–110, 39 L.Ed.2d 347 (1974) (quoting Wigmore with approval). In Wigmore's words:

> The opponent demands cross-examination, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.

5 WIGMORE § 1395, at 150. In addition, the Confrontation Clause compels a witness

> to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). *See also California v. Green,* 399 U.S. 149, 157–58, 90 S.Ct. 1930, 1934–35, 26 L.Ed.2d 489

(1970); *Davis,* 415 U.S. at 316, 94 S.Ct. at 1110. The combined effect of the various aspects of confrontation—physical presence, oath, cross-examination, and observation of the witness' demeanor, "serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings." *Maryland v. Craig,* 497 U.S. 836, 846, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990).

During trial, the immediate goal of most cross-examination is to produce more information about the witness, including information about "prior statements, inconsistent facts, ability to observe and recollect, bias and prejudice, lack of truth and veracity." Eleanor Swift, *Smoke and Mirrors: The Failure of the Supreme Court's Accuracy Rationale in White v. Illinois Requires a New Look at Confrontation,* 22 CAP.U.L.REV. 145, 151 (1993). Thus, the widely acknowledged purpose of cross-examination is "to test and challenge the evidence in front of the jury so that the jury will have all the information necessary to best assess what weight the evidence should be given." Jonakait, *supra,* 35 UCLA L.REV. at 587–88 (footnote omitted). Although the scope of cross-examination is generally limited to those subjects raised on direct examination, within that limit the defendant should be free to cross-examine "in order to elucidate, modify, explain, contradict, or rebut testimony given in chief." *Smallwood v. State,* 320 Md. 300, 307, 577 A.2d 356 (1990). In the context of the case at hand, the immediate purpose of the right to confrontation is to furnish the jury with "a satisfactory basis for evaluating the truth" of the prior statements. *Green,* 399 U.S. at 161, 90 S.Ct. at 1936.

It is true that the Confrontation Clause guarantees nothing more than "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam). It is equally true that the mere presence of the witness in the courtroom will not suffice. *See Simmons v.*

*State,* 333 Md. 547, 559, 636 A.2d 463 (1994) (witness who is physically seated on the stand but refuses to take an oath or answer any questions at all is not available). As the Supreme Court explained in *Fensterer,* 474 U.S. at 22, 106 S.Ct. at 295 "the Confrontation Clause is generally satisfied when the defense is given *a full and fair opportunity* " to probe the testimony of the witness (emphasis added). When the defendant's opportunity for cross-examination has been neither full nor fair, the right to confrontation has not been satisfied.

In *Douglas,* 380 U.S. 415, 85 S.Ct. 1074, the Supreme Court held that a witness is not available for full and effective cross-examination when he or she refuses to testify, regardless of whether the refusal to testify is predicated on privilege or punished as contempt. In that case, Douglas and a second man named Loyd were tried separately on charges of assault with intent to murder. The Court explained:

> Loyd was tried first and was found guilty. The State then called Loyd as a witness at petitioner's trial. . . . Loyd gave his name and address but, invoking the privilege [against self-incrimination], refused to answer any questions concerning the alleged crime. The trial judge ruled that Loyd could not rely on the privilege because of his conviction, and ordered him to answer, but Loyd persisted in his refusal.

*Id.* at 416, 85 S.Ct. at 1075. Under the guise of refreshing Loyd's recollection, the State then read into evidence the entire contents of a lengthy confession allegedly signed by Loyd, which named Douglas as the person who shot the victim. Loyd did not acknowledge making those statements. *Id.* at 419, 85 S.Ct. at 1077.

Under the circumstances, the Court concluded, "petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." *Id.* The Court emphasized:

> *We need not decide whether Loyd properly invoked the privilege* in light of his conviction. It is sufficient for the purposes of deciding petitioner's claim under the Confronta-

tion Clause that no suggestion is made that Loyd's refusal to answer was procured by the petitioner. . . .

*Id.* at 420, 85 S.Ct. at 1077 (emphasis added).

Although recent Supreme Court decisions have read the right to confrontation more narrowly than earlier cases,[2] the Court has never retreated from the central holding of *Douglas.* In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court held that out-of-court statements were not admissible as substantive evidence unless the prosecution can either "produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. at 2538. The Court characterized this principle as a "rule of necessity." In *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Court mitigated the strict holding of *Roberts,* and concluded that the rule of necessity did not apply to hearsay statements made by a co-conspirator during the course of the conspiracy.[3] *Id.* at 394–96, 106 S.Ct. at 1125–27. The Court emphasized, however, that the *Roberts* rule of necessity still applied to cases involving prior testimony. *Id.* at 393–95, 106 S.Ct. at 1125–26.

Under current Confrontation Clause doctrine, the prior testimony of a witness is not admissible as substantive evidence unless one of two tests is satisfied. When the declarant is unavailable for cross-examination, the second prong of the

---

2. *See* Jonakait, *supra,* 35 UCLA L.REV. 557; Swift, *supra,* 22 CAP. U.L.REV. 145; Barbara Rook Snyder, Defining the Contours of Unavailability and Reliability for the Confrontation Clause, 22 CAP.U.L.REV. 189 (1993).

3. The Court explained that because co-conspirator statements

are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. . . . Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand.

*Inadi,* 475 U.S. at 395, 106 S.Ct. at 1126. Thus, the Court concluded that co-conspirator statements are "better" and more probative than live testimony. *Id.*

*Roberts* test requires a showing that the testimony is "reliable," which may be satisfied if evidence falls within a "firmly-rooted" hearsay exception, or if there are other "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2539. If the prior testimony is unreliable, *as it was in the present case*, then the testimony cannot be admitted unless the witness takes the stand, and the defendant is afforded a full and fair opportunity for effective cross-examination. *See Douglas*, 380 U.S. at 419, 85 S.Ct. at 1077.

The Supreme Court's cases involving memory loss have not altered those principles. The Court's decision in *Green*, 399 U.S. 149, 90 S.Ct. 1930, for example, clearly illustrates the sort of trial performance that is necessary to satisfy the requirements of the Confrontation Clause. The key witness in that case, Porter, was arrested for selling marijuana to an undercover officer. While in police custody, Porter named Green as his supplier. Porter later testified at a preliminary hearing, and again identified Green as his supplier. During the hearing, Porter was cross-examined extensively by Green's attorney—the same attorney who represented Green at his subsequent trial. *Id.* at 151, 90 S.Ct. at 1931.

At trial, Porter was again the State's chief witness, but he proved to be evasive and uncooperative. Porter admitted that Green had phoned him, and that the two discussed selling some "stuff." Porter also admitted that he obtained twenty-nine plastic "baggies" of marijuana shortly thereafter. He explained, however, that he had taken LSD just prior to the phone call, and could not remember how he obtained the drugs. *Id.* at 151–52, 90 S.Ct. at 1931–32.

At various points during Porter's direct examination, the prosecution read excerpts from a transcript of Porter's previous testimony.[4] With his memory thereby "refreshed," Porter "guessed" that he had obtained the marijuana from the backyard of a home owned by Green's parents. On cross-examina-

---

4. At the time of Green's trial, § 1235 of the California Evidence Code provided that prior inconsistent statements were not barred by the rule against hearsay. *Green*, 399 U.S. at 150, 90 S.Ct. at 1931.

tion, however, Porter indicated that the out-of-court statements merely refreshed his memory of the testimony he had previously given, rather than his memory of the events themselves. He continued to assert that he did not remember how he obtained the marijuana. Later in the trial, Porter's prior statements to police were also admitted as substantive evidence. *Id.* at 152, 90 S.Ct. at 1931–32.[5]

In holding that Green had an adequate opportunity to cross-examine Porter regarding his former testimony, the Supreme Court emphasized that Porter acknowledged making the prior statements, and that Porter's prior statements were inconsistent with his trial testimony. The Court observed:

If the witness admits the prior statement is his, or if there is other evidence to show the statement is his ... the jury can be confident that it has before it two conflicting statements by the same witness. Thus ... *the witness must now affirm, deny or qualify the truth of the prior statement* under the penalty of perjury....

*Id.* at 158–59, 90 S.Ct. at 1935 (emphasis added). The Court explained further:

The witness who now relates a different story about the events in question must necessarily assume a position as to the truth value of his prior statement, *thus giving the jury a chance to observe and evaluate his demeanor as he either disavows or qualifies his earlier statement.* The jury is alerted by the inconsistency in the stories, and its attention is sharply focused on determining either that one of the stories reflects the truth or that the witness who has apparently lied once, is simply too lacking in credibility to warrant its believing either story.

*Id.* at 160, 90 S.Ct. at 1936 (emphasis added). In short, the obvious inconsistency between Porter's trial testimony and his

---

5. The Court declined to decide whether the Confrontation Clause was violated by the admission of those statements. The Court noted that the issue had not been decided below, and that neither party had addressed the issue on appeal. *Id.* at 168–70, 90 S.Ct. at 1940–41.

prior testimony required that Porter explain the discrepancy and the reasons for his memory loss.[6]

A pair of inconsistent statements are "[m]utually repugnant or contradictory," and so are contrary to one another that both statements cannot be true. BLACK'S LAW DICTIONARY at 766 (6th ed. 1990). By that definition, as well as the analysis in *Green*, Eiland's trial performance was not inconsistent with his prior testimony. Unlike Porter, Eiland did not relate two conflicting stories regarding the events surrounding the death of Jay Bias. He did not acknowledge making the prior statements, and neither affirmed nor denied the truth of those statements. As I noted earlier, the purpose of cross-examination in the present case was to furnish the jury with "a satisfactory basis for evaluating the truth" of Eiland's prior testimony. *See Green*, 399 U.S. at 161, 90 S.Ct. at 1936. There was nothing at all in Eiland's performance that might aid the jury with that task.

Justice Harlan, concurring with the result in *Green*, argued that the Confrontation Clause is satisfied by the physical presence of the witness in court. *Green*, 399 U.S. at 172, 90 S.Ct. at 1942 (Harlan, J., concurring). In *United States v. Owens*, 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951

---

**6.** The result in *Nance* rested on a similar trial performance:

All three witnesses were extensively cross-examined by the defense at trial. They were eager to offer testimony that attenuated any link between Petitioners and the crime. They were afforded an ample opportunity to explain or deny the inconsistencies between their trial testimony and their prior statements to police and the grand jury. This they did in a number of ways. They testified that police had misinterpreted their prior remarks, falsely recorded them, or elicited them by coercion. Harris and McCormick also suggested that heroin intoxication had eradicated their memories.

*Nance*, 331 Md. at 573, 629 A.2d 633.

Moreover, the above-quoted passage from *Nance* highlights the contrast between the nature of the witnesses; i.e., in *Nance* the Court was confronted with the so-called "turncoat witness." In no sense can Eiland be considered a "turncoat witness," the State never having any legitimate reason to consider Eiland's testimony as a part of its arsenal to be used at trial against Tyler. In other words, Eiland could not be viewed as a "turncoat witness" because he was never a witness the State had a right to count on.

(1988), the Court endorsed Justice Harlan's concurrence, but did so purely as dicta. As I explain below, the prosecution in *Owens* did more than simply produce the witness, and the defendant did, in fact, have a meaningful opportunity to probe the witness' out-of-court statement. The Court's decision in *Owens* cannot and should not be read as standing for the radical proposition that the right to confrontation is satisfied when the witness takes the stand and answers a few collateral questions, but refuses to testify further.

In *Fensterer*, 474 U.S. at 22, 106 S.Ct. at 295–96, the Court determined that the Confrontation Clause was not violated when an expert witness testified as to what opinion he formed, but could not recall which one of three methods he used to reach that conclusion. The Court said:

> The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Id.* at 21–22, 106 S.Ct. at 295. In *Owens*, 484 U.S. 554, 108 S.Ct. 838, the Court quoted *Fensterer* with approval, and added that a full and fair opportunity for effective cross-examination

> is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attention, his poor eyesight, and even (what is often a prime objective of cross-examination, see 3A J. Wigmore, Evidence § 995, pp. 931–932 (J. Chadbourn rev. 1970)) the very fact that he has a bad memory.

*Id.* at 559, 108 S.Ct. at 842.

In *Owens*, a man named Foster had been brutally beaten with a metal pipe. He sustained a fractured skull and his

memory was seriously impaired. When Mansfield, an FBI agent, first attempted to interview Foster, the latter was unable to remember the details of the assault. During a second interview, Foster named Owens as his assailant, and identified him from an array of photographs. *Id.* at 556, 108 S.Ct. at 840. The Supreme Court's description of Foster's trial performance is instructive in its analysis:

> At trial, Foster recounted his activities just before the attack, and described feeling the blows to his head and seeing blood on the floor. He testified that he clearly remembered identifying respondent as his assailant during his May 5th interview with Mansfield. *On cross-examination, he admitted that he could not remember seeing the assailant.* He also admitted that, although there was evidence that he had received numerous visitors in the hospital, he was unable to remember any of them except Mansfield, and could not remember whether any of these visitors had suggested that respondent was the assailant.

*Id.* (emphasis added). Thus, the jury had an opportunity to assess Foster's recollection of the beating, the circumstances surrounding Foster's identification of Owens, the extent of Foster's memory loss, and his general demeanor during cross-examination. In the instant case, by contrast, the jury had no opportunity to test Eiland's credibility or the truth of his prior testimony. If "the ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination," *Owens,* 484 U.S. at 559, 108 S.Ct. at 842, then Tyler was not afforded a "full and fair" opportunity to cross-examine Eiland.

The majority suggests that there is no "principled distinction" between a witness who cannot remember and one who refuses to testify. To the contrary, in *Owens,* the Supreme Court both recognized and explained that distinction. Because Foster testified at trial and was "subject to cross-examination," the Court concluded that his prior identification of Owens was not barred by the rule against hearsay. *Id.* at 561–62, 108 S.Ct. at 843–44. *See* FED.R.EVID. 801(d)(1)(C) (excluding certain prior statements of identification from the

definition of hearsay). In reaching that conclusion, the Court underscored the difference between a witness who refuses to testify and one who claims a memory loss:

*Just as with the constitutional prohibition* ... assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists. But that effect is not produced by the witness' assertion of memory loss—which, as discussed earlier, is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement.

*Owens,* 484 U.S. at 561–62, 108 S.Ct. at 844 (emphasis added). *Accord Nance,* 331 Md. at 573, 629 A.2d 633 (quoting the preceding language from *Owens* with approval). *See also Fensterer,* 474 U.S. at 19, 106 S.Ct. at 294 ("Quite obviously, an expert witness who cannot recall the basis for his opinion invites the jury to find that his opinion is as unreliable as his memory.").

As in both *Owens* and *Nance,* the statement "I don't remember" is a statement the truth of which can be tested during cross-examination. The defendant can probe the reasons for the memory loss, the extent of the memory loss, and the declarant's ability to recall the circumstances under which the prior statement was made. The responses to those questions, and the declarant's demeanor while answering, will afford the jury some basis for assessing the truth of the prior statement. The jury may also assess whether the memory loss is genuine or purposely evasive. As the Court explained in *Owens,* 484 U.S. at 560, 108 S.Ct. at 843:

The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee. They are, however, realistic weapons, as is demonstrated by defense counsel's summation in this very case, which emphasized Foster's memory loss and argued that his identification of respondent was the result of the suggestions of people who visited him in the hospital.

By comparison, a witness who persistently states "I can't answer that question" has not made a statement the truth of which can be tested. The statement is a blank, a cipher, a smooth stone wall, a sheer cliff with no footholds for climbing. The defendant may as well confront a mannequin, for all that the process will gain him. The statement itself says nothing about the witness's ability to recall and relate the events at issue. It says nothing about the credibility of the witness, the truth of the prior statement, or the circumstances under which that statement was made. For the defendant, the statement "I can't answer that question" is more damaging than mere silence. It invites the jury to speculate on the possibility that the defendant has threatened the witness, or has otherwise procured the refusal to testify.[7] In the absence of hard evidence, such speculation would be both improper and highly prejudicial.

## II

The application of these principles to the case at hand is illustrated by a pair of decisions from state and federal courts. In each case, one or more witnesses refused to testify without asserting a valid privilege, and the reviewing court concluded that admission of the witness's out-of-court statements was reversible error.

In *Mayes v. Sowders*, 621 F.2d 850 (6th Cir.1980), the defendant was convicted on two counts of robbery and two counts of murder. Mayes confessed to his participation in the robbery with his cousin, Leslie Beecham, but denied doing the actual shooting or stabbing. *Id.* at 851–52. Beecham also admitted his involvement in the robberies, but claimed that Mayes had done the killings. The shirt that Beecham wore during the second robbery had traces of human blood on it,

---

7. There are other reasons why a witness might refuse to testify. In *Carlos v. Wyrick*, 753 F.2d 691, 692 (8th Cir.1985), for example, the witness was a contract killer who apparently was attempting to protect an unknown accomplice. See section III, *infra* (discussing *Carlos* in more detail).

but Mayes's clothing did not. Beecham pled guilty to both the robberies and the murders, and his sentencing was deferred until after Mayes's trial. *Id.* at 853.

At trial, the prosecution called Beecham as a witness. Beecham "gave his name and address, answered two questions put to him by the prosecutor in the negative, and thereafter refused to testify further," despite a citation for contempt. The prosecution then called a police officer, who testified as to the "prior inconsistent statements" made by Beecham. *Id.* at 853.

On appeal from a writ of habeas corpus, the Sixth Circuit concluded:

A witness is not available for full and effective cross examination when he or she refuses to testify.... This is equally true whether the refusal to testify is predicated on privilege or is punishable as contempt, so long as the refusal is not procured by the defendant.

*Id.* at 856 (citing *Douglas,* 380 U.S. 415, 85 S.Ct. 1074). As in the present case, the Sixth Circuit stressed that Beecham's prior statements to police were unreliable:

Beecham's statement that Mayes killed the gas station attendant was not corroborated by Mayes' own confession, or any other evidence in the case. The oral statement was made during a custodial interrogation of Beecham, *after Beecham had been shown Mayes' statement that Beecham had been the guilty party.* The statement was self-serving.

*Id.* at 856 (emphasis added) (footnote omitted). Accordingly, the court concluded that the defendant did not have a full and effective opportunity to cross-examine Beecham, and that the introduction of Beecham's statements violated the defendant's Sixth Amendment right of confrontation. *Id.*

In *People v. Rios,* 163 Cal.App.3d 852, 210 Cal.Rptr. 271 (1985), the performance of two trial witnesses was remarkably similar to Eiland's performance. Rios was convicted of a murder that occurred during the course of a burglary. A prosecution witness, Torres, told a police detective that Rios admitted killing the victim. A second man, Carillo, told police

that Rios had approached him just prior to the crime. Rios spoke about "doing a job," and he asked Carillo for a gun. Carillo gave him a .25 caliber automatic pistol. Five minutes later, Carillo heard a gunshot nearby. The victim died of a .25 caliber gunshot wound to the chest. The murder weapon was not recovered. *Id.* 210 Cal.Rptr. at 275–76.

Torres had been called to testify during a preliminary hearing, refused to answer, and was sentenced to six months' incarceration for contempt. At the time of trial he was still incarcerated. He informed the trial court that he would again refuse to answer, even though he had no privilege and could face further contempt charges. Carillo had not testified previously, and was granted full immunity from prosecution for the burglary and murder. *Id.* at 276.

At trial, Torres and Carillo both took the stand and refused to testify. Each gave his name, and Carillo added his age. In response to further questions, both witnesses stated repeatedly, "I refuse to answer that question," "I refuse to answer that question," "I refuse to answer any question." *Id.* at 276–77 n. 2. After extensive argument by counsel, the trial judge ruled that the testimony given by each witness was an "implied denial" of their earlier statements to police, and that the out-of-court statements were admissible as substantive evidence under a California rule pertaining to prior inconsistent statements.[8] *Id.* at 276. Accordingly, a police detective was permitted to testify regarding the prior statements that Torres and Carillo had made to police.

On appeal, Rios challenged the admission of those statements, and the California Court of Appeals reversed. The court concluded that "the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful oppor-

---

8. Section 1235 of the California Evidence Code provided, in part: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing...." *See Rios,* 210 Cal.Rptr. at 278 n. 3.

tunity to cross-examine the witness." *Id.* at 279 (footnote omitted). The court also concluded that the witness's trial testimony was not "inconsistent" with the out-of-court statements. *Id.* at 278–79. In each instance, the court explained, "there is simply no 'statement' in the record which is inconsistent, or for that matter consistent, with prior statements; there is no 'express testimony' at all from which to infer or deduce implied inconsistency." *Id.* The court concluded: "[w]here, as here, the witnesses give no testimony, there is no evidence to support a finding of inconsistency." *Id.* The court explained that Rios was given no "meaningful opportunity" to cross-examine the witnesses:

> Observing the demeanor of a totally recalcitrant witness when questioned about matters he refuses to answer "is as meaningless as attempting to gain information as to the truth of unknown facts from his responses. Even *California v. Green's* holding rests on the assumption that meaningful trial confrontation will provide 'most of the lost protections [of contemporaneous cross-examination]'...." There was no evidence from which the jury could evaluate the circumstances surrounding the making of the previous statements by Torres and Carillo; no way to test the truth of the statement itself.

*Id.* at 280 (quoting *People v. Simmons*, 123 Cal.App.3d 677, 177 Cal.Rptr. 17 (1981) (quoting *Green*, 399 U.S. at 158, 90 S.Ct. at 1935)). The situation presented here compels the same conclusion. Because Tyler had no meaningful opportunity to test the truth of Eiland's prior statements, the admission of those statements violated his right to confrontation.

## III

I find further support for that conclusion in a plethora of cases dealing with a closely analogous situation. When a prosecution witness who testifies on direct examination subsequently refuses to answer certain questions on cross-examination, a clear majority of state and federal courts have concluded that the defendant's right of confrontation may be violated

if the trial court refused to strike relevant portions of the witness's direct testimony. As Wigmore explained:

> Where the witness, after his examination in chief on the stand, has *refused* to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed, and his direct testimony should be struck out.

5 WIGMORE § 1391(2), at 137. In *United States v. Cardillo*, 316 F.2d 606 (2d Cir.1963), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963), the Second Circuit articulated the test to be used in determining whether the Confrontation Clause has been violated by the trial court's failure to strike the relevant direct testimony:

> Where the privilege has been invoked as to the purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. . . . On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony. . . .

*Id.* at 611. The court noted that a distinction must be drawn between questions that "bear only on the credibility of the witness," and those which address the substance of the testimony given during direct examination. In the latter situation, the direct testimony "should be stricken in whole or in part." *Id.* See also *U.S. v. Zapata*, 871 F.2d 616, 623 (7th Cir.1989) ("When a witness' refusal to answer prevents [a] defendant from directly assailing the truth of the witness' testimony, the court should strike at least the relevant portion of the testimony.").

The test annunciated in *Cardillo* has been followed by nearly all federal circuits and the courts of most states.[9]

---

9. *See, e.g., Turner v. Fair*, 617 F.2d 7, 10 (1st Cir.1980); *United States v. Newman*, 490 F.2d 139, 145 (3rd Cir.1974); *United States v. Smith*, 342 F.2d 525, 527 (4th Cir.), *cert. denied*, 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965); *Fountain v. United States*, 384 F.2d 624, 628 (5th

*Cardillo* and its progeny generally involve a witness who asserts a valid privilege against self-incrimination. As in *Douglas* and *Mayes,* however, courts have emphasized that the assertion of a valid privilege is unnecessary. It makes no difference "whether the refusal to testify is predicated on privilege or is punishable as contempt, so long as the refusal is not procured by the defendant." *See Mayes,* 621 F.2d at 856.

In *Klein v. Harris,* 667 F.2d 274 (2nd Cir.1981), a witness named Rabinowitz testified that he and Klein had gone to the victim's house together and that Rabinowitz held the victim while Klein stabbed her. After he left the stand, Rabinowitz admitted to defense counsel that he lied on the stand under pressure from the assistant district attorney. He also admit-

---

Cir.1967); *United States v. Stephens,* 492 F.2d 1367, 1374–75 (6th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974); · *United States v. Zapata,* 871 F.2d 616, 624 (7th Cir.1989); *Smith v. United States,* 331 F.2d 265, 276–78 (8th Cir.), *cert. denied,* 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964); *United States v. Norman,* 402 F.2d 73 (9th Cir.1968), *cert. denied sub nom. Norman v. United States,* 397 U.S. 938, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970); *United States v. Nunez,* 668 F.2d 1116, 1121–22 (10th Cir.1981); *United States v. Hirst,* 668 F.2d 1180, 1183 (11th Cir. 1982); *Jackson v. State,* 695 P.2d 227 (Alaska Ct.App.1985); *State v. Dunlap,* 125 Ariz. 104, 608 P.2d 41 (1980); *Robertson v. State,* 298 Ark. 131, 765 S.W.2d 936 (1989); *People v. Coca,* 39 Colo.App. 264, 564 P.2d 431 (1977); *State v. Roma,* 199 Conn. 110, 505 A.2d 717 (1986); *Johnson v. United States,* 418 A.2d 136 (D.C.1980); *Kelly v. State,* 425 So.2d 81 (Fla.Dist.Ct.App.1982), *cert. denied,* 434 So.2d 889 (Fla.1983); *Smith v. State,* 225 Ga. 328, 168 S.E.2d 587 (1969), *cert. denied,* 396 U.S. 1045, 90 S.Ct. 695, 24 L.Ed.2d 689 (1970); *People v. Harris,* 123 Ill.2d 113, 122 Ill.Dec. 76, 526 N.E.2d 335 *cert. denied,* 488 U.S. 902, 109 S.Ct. 251, 102 L.Ed.2d 240 (1988); *In the Interest of J.D.S.,* 436 N.W.2d 342 (Iowa 1989); *State v. Montanez,* 215 Kan. 67, 523 P.2d 410 (1974); *Thomas v. State,* 63 Md.App. 337, 492 A.2d 939 (1985); *Commonwealth v. Funches,* 379 Mass. 283, 397 N.E.2d 1097 (1979); *People v. Fuzi,* 116 Mich.App. 246, 323 N.W.2d 354 (1982); *State v. Spencer,* 311 Minn. 222, 248 N.W.2d 915 (1976); *State v. Brown,* 549 S.W.2d 336 (Mo.1977); *State v. Bittner,* 188 Neb. 298, 196 N.W.2d 186, *cert. denied,* 409 U.S. 875, 93 S.Ct. 123, 34 L.Ed.2d 127 (1972); *State v. Rogers,* 80 N.M. 230, 453 P.2d 593 (Ct.App.1969); *People v. Chin,* 67 N.Y.2d 22, 499 N.Y.S.2d 638, 490 N.E.2d 505 (1986); *State v. Ray,* 336 N.C. 463, 444 S.E.2d 918 (1994); *Commonwealth v. Learn,* 233 Pa.Super. 288, 335 A.2d 417 (1975); *State v. Iron Thunder,* 272 N.W.2d 299 (S.D.1978); *Decker v. State,* 734 S.W.2d 393 (Tex.Ct.App.1987); *State v. Pickens,* 27 Wash.App. 97, 615 P.2d 537 (1980). *See also* 5 WIGMORE § 1391(2) and cases cited therein.

ted that he, not Klein, had actually killed the victim. The defense recalled Rabinowitz to the stand, but Rabinowitz invoked the privilege against self-incrimination and refused to answer further questions. *Id.* at 279–80.

The Second Circuit held that Rabinowitz's original testimony resulted in a testimonial waiver of his fifth amendment privilege, and that Rabinowitz should have been ordered to testify under penalty of contempt. *Id.* at 288–89. The court concluded:

> If the witness thereafter continues to refuse to testify, and if the refusal precludes the defendant from testing the truth of the witness' prior testimony, the trial judge must strike the prior testimony.... The failure of the trial judge to take such corrective action deprives the defendant of his sixth amendment right of confrontation.

*Id.* at 289 (citations omitted).

The Eighth Circuit reached a similar conclusion in *Carlos v. Wyrick,* 753 F.2d 691 (8th Cir.1985). McGuire, a prosecution witness, testified that Carlos had hired him to carry out a contract killing. McGuire also stated that he was accompanied by an unidentified companion. On cross-examination, defense counsel attempted to question McGuire about the identity of his companion. *Id.* at 692. McGuire did not invoke the privilege against self-incrimination, but repeatedly stated "I would rather not answer that." *See Carlos v. Wyrick,* 589 F.Supp. 974, 977–78 (W.D.Mo.1984) (discussing the facts of the case in greater detail). The Eighth Circuit concluded that McGuire's refusal to answer questions bearing directly on the circumstances surrounding the murder deprived Carlos of his right of confrontation, and that McGuire's testimony concerning events at the time and place of the murder should have been stricken. *Carlos,* 753 F.2d at 693.

In *Thomas v. State,* 63 Md.App. 337, 492 A.2d 939 (1985), we endorsed and applied the *Cardillo* test. As in *Cardillo,* a witness offered by the State asserted his fifth amendment privilege on cross-examination. Judge Karwacki, writing for this Court, explained that the defendant's right to confronta-

tion had not been violated because the questions that the witness refused to answer were directed to purely collateral matters, including the credibility of the witness. *Id.* at 345–46, 492 A.2d 939.

In the instant case, Eiland's testimony was anything but collateral—it went to the very heart of the State's case against Tyler. Had Eiland simply repeated his prior testimony on direct examination, but refused to answer questions during cross-examination, the test we applied in *Thomas* would compel the conclusion that his direct testimony should be stricken. I see no principled reason why his self-serving, presumptively unreliable testimony from the earlier trial should be accorded more deference. Indeed, Eiland's personal stake in the outcome of the earlier trial suggests that his testimony from that trial should be treated with less.

Although *Cardillo, Klein, Carlos* and *Thomas* do not involve the precise situation presented here, they provide forceful support to the conclusion that Tyler's right to confrontation was violated by the admission of Eiland's prior testimony. In each of those cases, the critical witness gave testimony at trial, *in the presence of the jury* that was charged with the task of deciding the defendant's fate. Thus, the jury had an opportunity to observe the demeanor of the witness, and had some basis for evaluating the truth of the testimony given. In the present case, of course, the jury had nothing from which it could evaluate Eiland's credibility or test the truth of his prior testimony. It could neither observe Eiland's demeanor, nor was there any opportunity for counsel to probe questions of bias, motive, the ability to observe or recollect, or inconsistencies. Moreover, *Cardillo, Klein, Carlos* and *Thomas* all demonstrate that the willingness of the witness to answer questions on direct examination is not sufficient to satisfy the defendant's right to confrontation. Something more is required.

## IV

I disagree with the majority's assertion that Tyler failed to preserve the issue for appellate review by failing to make

some attempt at cross-examining Eiland *after* the introduction of his prior testimony. One must consider the events that transpired before the testimony was introduced. On March 3, the State and the trial judge made extensive efforts to question Eiland, to no avail. Eiland was held in contempt and spent the next eighteen days in jail. On March 21, the State and the judge again attempted to question Eiland, again to no avail. Defense counsel then questioned Eiland, and received two replies of "I can't answer." Immediately before the prior testimony was introduced, *the trial judge determined that Eiland was unavailable* and ruled that Eiland's trial testimony was admissible under the exception for Former Testimony. The trial judge did not rule that the prior testimony was admissible under *Nance;* indeed, such a ruling would have been inconsistent with his conclusion that Eiland was not available. Under those circumstances, I think it unreasonable to conclude that Tyler was required to ask questions of an "unavailable" witness. Tyler properly objected to the admission of the testimony. Nothing further was required.

I also disagree with the majority's assertion that Tyler somehow "procured" Eiland's refusal to testify. The majority offers three distinct theories by which the trial judge *might* have reached that conclusion:

1) Because Tyler and Eiland were "fast friends," Eiland "might have resorted to any reasonable measure, short of convicting himself, to keep from damaging testimonially his erstwhile friend."

2) The alleged intimidation of Eiland might have been orchestrated by Tyler, or by his "supporters," "friends," or "adherents."

3) Tyler "strenuously" requested a trial severance, and "strenuously" objected to the continuance and other efforts designed to compel Eiland's testimony.

At the outset, the State is in complete control of the prosecution's case under our adversarial system; to somehow attribute to the appellant the ability to orchestrate the intricate scheme proposed by the majority loses sight of the fact

that it was the State that made the decision to call a witness that it never had reason to believe would be other than hostile—a decision which put into motion the sequence of events culminating in the improper admission of the transcript of Eiland's trial testimony. The majority's thesis appears to proceed on a curious theory of the State's entitlement to the co-defendant's testimony. Absent procurement of wrongdoing by appellant or some other act on his part to impede the search for the truth, no such entitlement exists.

With regard to the first two theories, the pertinent evidentiary rules provide that a litigant may not *procure* the unavailability of a witness, or otherwise prevent a witness from testifying. *See* LYNN MCLAIN, 6 MARYLAND EVIDENCE 445; MD.RULE 5–804(A). Thus, Tyler is simply not responsible for the conduct of his "friends," "supporters," or "adherents" unless he somehow "procured" their conduct. Whether Tyler himself persuaded, induced, prevailed upon, coerced, or otherwise caused his friends, adherents or supporters to do anything at all is a question of *fact*, to be determined by the trial judge. Judge Ahalt made no such finding, and it is impermissible for this court to speculate on the mere possibility that such a finding might have been made.

The degree of speculation involved is readily apparent from the majority's opinion. At some points, the majority theorizes that Eiland and Tyler were in cahoots, and that the two men conspired in a clever gambit to win a joint acquittal. At other points, the majority suggests that Tyler, through his supporters, may have threatened Eiland's life. We may, of course, uphold the trial court's ruling on *legal* grounds other than those relied upon by the judge. We may not uphold the trial court's ruling on the basis of speculation, when the necessary factual findings were not made.

The majority's suggestion that Tyler's trial tactics somehow contributed to Eiland's unavailability is equally untenable. The majority refers to this theory as "at least a modest additional makeweight," apparently in acknowledgement that this hypothesis is added as a "filler" without any independent

merit or worth. It is axiomatic that no criminal defendant should be penalized for merely *requesting* relief, even when the request borders on being frivolous. In *Johnson v. State,* 274 Md. 536, 336 A.2d 113 (1975), the defendant pled not guilty to all charges. A jury thereafter convicted Johnson of burglary, and the judge sentenced Johnson to twelve years. During the sentencing hearing, the trial judge told Johnson that "if you had come in here with a plea of guilty . . . you probably would have gotten a modest sentence." *Id.* at 543, 336 A.2d 113. The Court of Appeals vacated the sentence, and explained its decision as follows:

> [A] price may not be exacted nor a penalty imposed for *exercising the fundamental and constitutional right* or requiring the State to prove, at trial, the guilt of the petitioner as charged. This is as unallowable a circumstance as would be the imposition of a more severe penalty because a defendant asserted his right to counsel or insisted on a jury rather than a court trial.

*Id.* (Emphasis added).

A similar principle applies to the case at hand. Tyler had a right to *request* a trial severance, and a right to request that his trial be completed swiftly, without the delay of an eighteen day continuance. Such requests are routinely made in criminal cases. They are also routinely denied, even when the request is made with great vigor. At best, the majority effectively suggests that Tyler must somehow be blamed or punished simply for making those requests. At worst, the majority effectively suggests that Tyler's guilt may be inferred from his decision to put forward a vigorous defense. Tyler did not *grant* his own motion for severance. The trial court granted the motion, and Tyler cannot be penalized for the court's decision.

With respect to the majority's "Alternative Rationale," it posits that, reduced to its singular significance, the prior testimony of Eiland is but an "identification of the shooter," sanctioned by *Nance, Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982) and other authorities which hold that an extrajudicial

identification may be received as substantive evidence under certain conditions. Citing *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the majority correctly points out that "[i]n *Nance,* the identification in issue did not involve the classical weighing of reliability factors versus the risk of misidentification."

To be sure, we are not here so much concerned with the lighting at the time of the crime, the opportunity to observe and other factors which could result in misidentification. We are, in the case *sub judice,* concerned with something far more sinister than an eyewitness's innocent—but mistaken—identification of the criminal agent. We are here concerned with the whole cloth of a co-defendant's testimony calculated to achieve a singular purpose—his acquittal.

This is not such a case as that presented when there is an attempt by a witness to a crime, ostensibly in aid of an investigation, to make an identification of the perpetrator in furtherance of the apprehension and prosecution of a suspect and the witness subsequently recants. The theory in such cases is that there is inherent trustworthiness in the initial identification prior to the intervention of some impediment, be it memory loss, intimidation, or other forces. At no point in time could Eiland's testimony be viewed as reliable. Could Eiland have been expected to testify any differently than he did regardless to whether he was in fact the shooter? Therein lies the inherent unreliability of his prior testimony and the reason why prior decisions allowing extra judicial identifications, where there is no other hearsay exception, require "the identifying victims or eyewitnesses [to be] present and subject to cross examination," *Johnson v. State,* 237 Md. 283, 206 A.2d 138 (1965). In fact, the common thread running through virtually all of the identification decisions is that the witness could be tested as to why he or she was unable to identify the defendant at trial. [For in-depth discussion, *see Smith and Samuels v. State,* 6 Md.App. 59, 250 A.2d 285 (1969)].

The salient distinction in the case *sub judice* is that there never was a reliable, trustworthy identification that Eiland

recanted. At all times, the testimony in question was calculated, not to further a homicide investigation, but to facilitate the acquittal of an accomplice. To reiterate the obvious, *Nance* addresses the problem of a "Turncoat Witness." One cannot be a turncoat when he was never cast in the role of a witness for the prosecution in the first instance. I believe the majority, to use its words, has indeed "prob[ed] the outer limits of a principle's logic," both as to the primary thesis and the Alternative Rationale.

## V

Had both Eiland and Tyler been acquitted, given the evidence before the jury, it would have indeed been a miscarriage of justice. The overwhelming evidence was that only the two defendants were within the vehicle from which the shots were fired; hence, at least one of the two was necessarily guilty. Accordingly, the trial judge expressed his desire to discover a way "where substantial justice [could] be done for the community." [10] In our appellate review of the lower court proceedings, we must not allow the facts of a given case to cause us to fashion a rule of law that will result in "substantial [in]justice" when applied to subsequent cases. In crafting the rules of constitutional criminal procedure, we must not permit our decision to be fact-driven and we must be cognizant that ofttimes it is the culpable [or more culpable] member of a criminal enterprise who, by his own devices or fortuitously, winds up pointing his finger at his co-defendant. Bearing that in mind, we must be vigilant that we maintain a system of criminal justice "in which the perception as well as the reality of fairness prevails" for all criminal defendants, regardless of the outcome in any one case. *See Lee,* 476 U.S. at 540, 106 S.Ct. at 2061.

The grave importance of our task is underscored by the facts of *Klein,* 667 F.2d 274. In that case, the defendant was

---

**10.** This case was widely reported in the news media because of the notoriety of the circumstances surrounding the death of the victim's brother.

convicted of second degree murder on the testimony of a witness who later admitted that he, and not the defendant, had actually killed the victim. *Id.* at 279–80. The majority's ruling may one day lead to a similar result. Assume, for a moment, that Tyler had pulled the trigger, and that Eiland was unaware of Tyler's intentions until the fatal shot was fired. Assume further that *Tyler* had been tried first, and that he had been acquitted after shifting all blame on Eiland. If Tyler refuses to testify at Eiland's trial, should the transcript of Tyler's earlier testimony be admitted against Eiland? The majority's decision effectively undermines a fundamental right designed to facilitate the search for truth. The net result is the creation of a mechanism whereby a wily killer might succeed in transferring blame onto the shoulders of an unwary subject.

There is a second and perhaps more common scenario by which a substantial injustice might be done. One culpable, but not the master mind during a criminal event, might be convicted of the more serious crime than any act that he or she actually committed. Hence, assume that an unplanned murder occurs during the course of a robbery. The triggerman, who acted with malice aforethought, is tried first, and shifts all blame for the killing to his accomplice. The accomplice—guilty only because of criminal responsibility imputed by felony murder—might then be convicted of second or even first degree murder, on the strength of the real killer's prior testimony. Effective cross-examination is the only means by which the accomplice can parry such a thrust. *Compare Mayes,* 621 F.2d 850 (wherein two robbers each accused the other of killing the victims). The possibility that a defendant might be convicted of a crime that he or she did not commit must not be taken lightly.

For the reasons set forth above, I am not persuaded that Tyler had a full, fair, and meaningful opportunity for effective cross-examination, and, consequently, I conclude that the admission of Eiland's prior testimony violated Tyler's right to confrontation, under both the Sixth Amendment and Article 21 of the Maryland Declaration of Rights. Because the error

was undoubtedly prejudicial, I would reverse Tyler's convictions and remand for a new trial. A jury could well find the evidence of the shots having been fired from a vehicle occupied by two men, only one of whom had a motive to kill Bias, sufficient to convict Tyler at a retrial.

SALMON, Judge, dissenting in which BLOOM, J., joins.

I dissent from that portion of this Court's opinion holding that the testimony given at Eiland's December 1993 trial was admissible against Tyler. I would reverse and remand for a new trial.

Tyler had the right, guaranteed by the Sixth Amendment to the United States Constitution,[1] to confront Eiland regarding his previous trial testimony. The right to confront a witness includes the opportunity for full and effective cross-examination, meaning that Tyler's attorney had the right to put questions to Eiland and obtain "immediate answers" to those questions. Tyler was denied his right to confront Eiland. Moreover, Eiland's prior sworn testimony did not fit within the *Nance* rule. It was hearsay "bare and unredeemed." *United States v. Allied Stevedoring Corp.*, 241 F.2d 925, 933 (2d Cir.), *cert. denied,* 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957).

On March 3, 1994, in front of the jury, Eiland was sworn and proceeded to give the legal equivalent of his name, rank, and serial number. He was then asked five questions relating to Jay Bias's murder. Those questions were:

1. Did you shoot Jay Bias?

---

1. The Confrontation Clause of the Sixth Amendment to the United States Constitution declares: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." The Confrontation Clause of Art. 21 of the Maryland Declaration of Rights proclaims: "That in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him...." The Confrontation Clause of the Sixth Amendment and Art. 21 of the Maryland Declaration of Rights are in *pari materia. Craig v. State,* 322 Md. 418, 430, 588 A.2d 328 (1991).

2. Are you the same Mr. Eiland that testified in a previous proceeding?

3. Were you in the car when Jay Bias was shot?

4. Were you in the Prince George's Plaza mall on December 4, 1990?

5. Were you in a green Mercedes that was occupied with Jerry Tyler at the Prince George's Plaza mall on December 4, 1990?

To each of those questions Eiland responded, "I can't answer the question." At the request of the State, Judge Ahalt ordered Tyler to answer the questions. Tyler remained adamant. His retort to every additional substantive question was, "I can't answer the question." Counsel for the State, Tyler, and Eiland then had a bench conference. At the bench conference, Judge Ahalt interpreted Eiland's answers as a refusal to testify.[2] It is important to note that the words "I can't answer that question" were not interpreted by Judge Ahalt or counsel as meaning "I am unable to answer that question." The trial judge next held Eiland in contempt and recessed court for eighteen days. Prior to the recess, Eiland was not cross-examined by counsel for Tyler.[3]

---

**2.** The court found:

> I am persuaded by the proceedings that occurred in my presence on the record before all parties concerned, that the witness fully knows and understands what he's doing here in Court, is of sufficient age and knowledge to comprehend the nature of the proceedings; that he is not under any medication or anything that would interfere with his ability to understand what is occurring here in the proceedings.
>
> I further conclude that he has been asked relevant questions of inquiry in the trial that we are presently in the process of conducting; that he has no justified reason for not testifying.

**3.** Eiland was at no time, in the jury's presence, turned over to the defense for cross-examination. The reason for this, evidently, was that everyone at trial assumed that Eiland's refusal to testify made him unavailable for either direct or cross-examination. After the 18 day recess, out of the presence of the jury, Tyler's attorney asked Eiland two questions regarding whether he had been threatened. Eiland refused to answer those questions.

On March 21, 1994, Eiland took the stand again, this time out of the jury's presence. He was asked only two questions concerning the Bias murder, viz:

1. Did you shoot Jay Bias?
2. Were you at the Prince George's Plaza mall on December 4, 1990?

To both questions, Mr. Eiland again answered, "I can't answer that question." The trial judge asked, "Can you tell me any reason why you continue to refuse to testify?" Eiland answered, "No." Judge Ahalt ruled that Eiland had "purposefully and intentionally violated" an order of court by his refusal. Eiland was thereupon again held in contempt and remanded to the custody of the sheriff. Over appellant's objection, the State was then allowed to read into evidence what Eiland had testified to at his December 1993 trial.

## RIGHT TO CONFRONTATION

It is crystal clear that Eiland would have refused to answer *any* substantive question regarding the murder of Jay Bias if additional questions had been asked of him by either the court or counsel. This was the reason Judge Ahalt held that Eiland was "unavailable" as a witness. If Eiland had a legally justified reason to remain silent, Eiland's prior trial testimony would unquestionably have been inadmissible under *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and *Nance v. State,* 331 Md. 549, 572, 629 A.2d 633 (1993). In *Douglas,* the Supreme Court held that a defendant's rights under the Confrontation Clause were violated when the prosecution was allowed to read into evidence prior testimony of a witness implicating the defendant, after the witness had invoked his Fifth Amendment privilege against self-incrimination. In *Nance,* the Court said: "Witnesses who are not actually available for cross-examination despite their presence in the court are, for example, those who refuse to testify by asserting the spousal privilege or the privilege against self-incrimination." *Id.* at 572, 629 A.2d 633 (citing *People v. Redd,* 135 Ill.2d 252, 142 Ill.Dec. 802, 837, 553 N.E.2d 316, 351 (1990)). *See also,* 4 Weinstein & Berger,

Weinstein's Evidence United States Rules, ¶ 801(d)(1)(A)(01) at 801–144 (1988); McClain, Maryland Rules of Evidence, p. 225 (1994 ed.). Here, Eiland's refusal was without justification. The question then becomes: For purposes of the implementation of the right to confrontation as guaranteed by the Sixth Amendment, does it matter whether Eiland's refusal was justified? The answer to that question should determine the outcome of this case. Impliedly, the majority answers, "yes" to that question. In my view, with one exception discussed *infra*, it does not matter why Eiland refused to testify. Because he would not answer substantive questions, he was not available for cross-examination.

The purpose of the Confrontation Clause was explained one hundred years ago in *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895):

> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits * * * being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of *testing the recollection and sifting the conscience of the witness*, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and *the manner in which he gives his testimony whether he is worthy of belief.*

(Emphasis added).

More recently, in *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970), the Court said:

> Viewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to *full and effective cross-examination.*

> This conclusion is supported by comparing the purposes of confrontation with the alleged dangers in admitting an out-of-court statement. Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding

against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility. (Emphasis added).

In *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), the Supreme Court explained further:

The Sixth Amendment to the Constitution guarantees the right to an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically. "Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Professor Wigmore stated:

"The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination*. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." (Emphasis in original.) 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940).

Because, as stated in *Davis, supra,* cross-examination cannot be had "except by the direct and personal putting of questions and obtaining immediate answers," Tyler had no opportunity to cross-examine Eiland fully and effectively. The fact that Eiland's refusal to answer questions was unjustified cannot change this reality.

The majority says, at 522:

In the case of Eiland, there was nothing to prevent the fact finders from looking upon him, listening to him, observing his demeanor as he answered or refused to answer, and assessing him in some meaningful fashion. None of this occurred in *Simmons v. State.*

By analogy: If a prisoner of war gives his interrogator his name, rank, and serial number but refuses to answer any other questions, the questioner may very well assess him in some meaningful fashion (prisoner is brave, clean, alert, fidgety, etc.), but the questioner will not gain any insight into the prisoner's credibility. Likewise, the jury could gaze upon Eiland while he was on the stand. Because he refused to answer every question regarding Jay Bias's murder, however, the jury could not possibly accurately judge his credibility on that subject.

The rule that is here applicable was set forth in *Mayes v. Sowders,* 621 F.2d 850, 856 (6th Cir.), *cert. denied,* 449 U.S. 922, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980):

A witness is not available for full and effective cross-examination when he or she refused to testify. *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). *This is equally true whether the refusal to testify is predicated on privilege or is punishable as contempt, so long as the refusal to testify is not procured by the defendant. Douglas v. Alabama, supra,* 380 U.S. at 420, 85 S.Ct. at 1077; *Motes v. United States,* 178 U.S. 458, 471, 20 S.Ct. 993, 998, 44 L.Ed. 1150 (1900); *United States v. Mayes,* 512 F.2d 637, 650–52 (6th Cir.), *cert. den.,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975).

(Footnote omitted; emphasis added).

In this case, there was no finding that Eiland's unavailability was procured by the defendant. Thus, the exception mentioned in *Mayes* is inapplicable.

In *Mayes* the defendant was charged with the robbery of a service station. A witness was called by the prosecution who answered two substantive questions. One of the questions was whether he was at the scene of the robbery for which defendant was charged. The witness answered, "No." Thereafter, the witness refused to testify further despite a conference in the judge's chambers and ultimately a contempt citation. The prosecutor called an investigating police officer who contradicted the witness's testimony that he was not at the scene of the robbery. The officer proceeded to testify, *inter alia*, that the witness had told him that he and the defendant were at the service station, that he and the defendant robbed it, and that in the course of the robbery defendant shot the service station attendant. The *Mayes* Court held that the defendant's right to confrontation was violated by the admission of the witness's prior statement to the police officer. *Id.* at 856.

It is true that the mere fact that a hearsay declarant cannot be cross-examined does not necessarily mean that admission of the hearsay violates the Confrontation Clause. *Simmons v. State*, 333 Md. 547, 556, 636 A.2d 463 (1994). The proponent of the hearsay, however, must prove: 1) the necessity of introducing the out-of-court statement, and 2) the out-of-court statement bears adequate *indicia* of reliability. *Id.* Necessity was shown here because Eiland was unavailable as a witness. A hearsay statement bears adequate *indicia* of reliability if it is based upon a "firmly rooted" hearsay exception. *Id.* at 556–557, 636 A.2d 463. No firmly rooted hearsay exception is here applicable.

Even if the hearsay exception is not "firmly rooted," the statement may still be admissible if the proponent makes a showing that the statement has "particularized guarantees of trustworthiness." *Nance*, 331 Md. at 560, 629 A.2d 633. There is a presumption, however, which the State must overcome, that the out-of-court statement is unreliable. *Id.* at 564, 629 A.2d 633. The mere fact that the statement is made under oath is not enough to guarantee trustworthiness. *United States v. Lang*, 904 F.2d 618, 623 (11th Cir.), *cert. denied*,

498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). The "particular guarantee of trustworthiness" must be shown by relevant circumstances that "surround the making of the statement and that render the declarant particularly worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990). Such circumstances may not include other evidence that would corroborate the veracity of the declarant's out-of-court statement. *Simmons, supra,* 333 Md. at 561–62, 636 A.2d 463. Eiland's testimony given at his own trial in December 1993 before Judge Ahalt and a jury was completely self-serving. If convicted at the December 1993 trial, Eiland would have been eligible to receive a prison sentence of thirty years—the same sentence he received from Judge Ahalt after his first conviction. Eiland had the strongest of motives to testify falsely in order to absolve himself of blame and to cast it entirely on Tyler. The State failed to overcome the presumption that Eiland's December 1993 trial testimony was unreliable. The admission of Eiland's prior testimony violated Tyler's Sixth Amendment right to confront his accuser.

### THE NANCE EXCEPTION

I do not agree that Eiland's testimony fits within the *Nance* exception to the rule against hearsay. The State failed to prove two necessary predicates for the application of that rule, viz: 1) that Eiland's testimony presented to the jury on March 3, 1994 was inconsistent with the testimony Eiland gave at his own trial in December 1993 and 2) that Eiland was available at Tyler's trial for cross-examination regarding his prior testimony.

In order for a statement to be admissible under the *Nance* rule, there must be an inconsistency between the prior testimony and the witness's trial testimony. *Nance, supra,* 331 Md. at 568, 629 A.2d 633. I read the term "inconsistency" as used in the *Nance* exception to mean self-contradiction. In support of the modern rule allowing use of a prior inconsistent statement as substantive evidence, the *Nance* Court did not define the term "inconsistent." It did, however, justify the

modern rule by quoting two authorities—McCormick and Learned Hand. Both of those authorities stress the element of self-contradiction in the witness's testimony, *i.e.*, the fact-finder compares the story the witness told earlier with the story he now tells. The *Nance* Court said:

> The modern rule is widely supported by the commentators. McCormick asserts that the availability of cross-examining the declarant satisfied the aim of the hearsay rule to exclude untrustworthy evidence:
>
> > *[T]he witness who had told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore.* It will go hard, but the two questioners will lay bare the sources of the change of face, in forgetfulness, carelessness, pity, terror or greed, and thus reveal which is the true story and which the false. It is hard to escape the view that evidence of a previous inconsistent statement, when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony.
>
> C. McCormick, *The Turncoat Witness: Previous Statements as Substantive Evidence*, 25 Tex.L.Rev. 573. 577 (1947). *Accord* 3A Wigmore, *supra*, § 1018(b) (because purpose of hearsay rule is satisfied when witness is present and subject to cross-examination, former extrajudicial statement should be granted substantive value).

Supporters of the modern rule have long rejected the notion that the trier of fact must observe contemporaneously the declarant's demeanor when making the out-of-court statement. *Judge Learned Hand aptly observed that when a jury decides that what a witness says now is not the truth, but what he said before was truthful, they nonetheless are deciding from what they see and hear of that person in court. Di Carlo v. United States,* 6 F.2d 364, 368 (2d Cir.1925). Some 30 years later Judge Hand returned to this theme:

It is one thing to put in a statement of a person not before the jury: that is indeed hearsay bare and unredeemed. But it is quite a different matter to use them when the witness is before the jury, as part of the evidence derived from him of what is the truth, for it may be highly probative to observe and mark the manner of his denial.... Again and again in all sorts of situations we become satisfied, even without earlier contradiction, not only that a denial is false, but that the truth is the opposite.

*United States v. Allied Stevedoring Corp.*, 241 F.2d 925, 933 (2d Cir.), *cert. denied*, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (1957).

331 Md. at 565–66, 629 A.2d 633 (emphasis added).

The majority holds, at 540, that Tyler's refusal to answer the questions "Did you shoot Jay Bias?" and "Were you in the car when Jay Bias was shot?" is just as inconsistent with his prior testimony as if he had answered "I can't remember" to both questions.

At its core, nearly all testimony at any trial is memory testimony.[4] When a witness says, "I saw Jeffrey Tyler shoot Jay Bias," that testimony means, "I remember seeing Jeffrey Tyler shoot Jay Bias." Therefore, if a witness says at a second trial, "I can't remember who shot Jay Bias," the two answers *are* inconsistent. The *Nance* Court recognized this in note 5:

Inconsistency includes both positive contradictions and claimed lapses of memory. *State v. Devlin*, 251 Mont. 278, 825 P.2d 185, 187 (1991). When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. *People v. Johnson*, 3 Cal. 4th 1183, 14 Cal.Rptr.2d 702, 719, 842 P.2d 1, 18 (1992).

331 Md. at 564, 629 A.2d 633.

---

4. Opinion testimony is one major exception.

Eiland did not testify[5] inconsistently at Tyler's trial. He told one story at his own (second) trial and no story whatsoever at Tyler's second trial.[6] Eiland's trial performance subjected him to a charge of contempt[7] but not to a charge of perjury.

---

5. When counsel or the Judge asked a question of Eiland and he refused to answer, it is doubtful whether this constituted testimony. In *Douglas, supra,* the prosecutor read to the witness several portions of a statement that the witness [Loyd] had given to the police. After reading a portion of the statement, the prosecutor would then ask Loyd, "Did you say that?" In regard to this procedure, Justice Brennan, for the Court, said,

> Although the solicitor's reading of Loyd's alleged statement, and Loyd's refusal to answer, were not technically testimony, the solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true. Since the solicitor was not a witness, the inference from this reading that Loyd made the statement could not be tested by cross-examination. Similarly, Loyd could not be cross-examined on a statement imputed to him but not admitted by him. . . .

*Douglas,* 380 U.S. at 419, 85 S.Ct. at 1077.

6. Other states agree that a refusal to testify is not inconsistent with prior testimony or statements. *People v. Rios,* 163 Cal.App.3d 852, 210 Cal.Rptr. 271, 279 (1985) (recognizing that, where a "stonewalling" witness refuses to answer any questions at trial, "there is simply no 'statement' in the record that is inconsistent . . . with prior statements; there is no 'express testimony' at all from which to infer or deduce implied inconsistency"); *Barksdale v. State,* 265 Ga. 9, 453 S.E.2d 2, 4 (1995) (holding that a witness's prior videotaped statement was inadmissible because the witness "refused to answer any questions [at trial] and thus gave no testimony in court with which the prior statement could be judged to be inconsistent"); *State v. Williams,* 182 N.J.Super. 427, 442 A.2d 620, 623 (App.Div.1982) (holding that the witness's refusal "to answer any questions about the crimes he had detailed in an earlier statement" was not "testimony" and thus could not "create an inconsistency between trial testimony and an out-of-court statement"); *Davis v. State,* 773 S.W.2d 592, 593 (Tex.Ct.App.1989) (recognizing that a refusal to testify is not an inconsistent statement); *see also Commonwealth v. Brown,* 619 S.W.2d 699, 703–04 (Ky.1981), *overruled on other grounds,* 652 S.W.2d 69 (Ky.1983); *State v. Platt,* 85 N.C.App. 220, 354 S.E.2d 332, 335 (1987), *rev. denied,* 320 N.C. 516, 358 S.E.2d 529 (1987).

7. A criminal information was filed naming Eiland as a defendant in the Circuit Court for Prince George's County, Maryland (CT 94–07724).

## AVAILABILITY FOR CROSS-EXAMINATION

To be "available for cross-examination" within the meaning of *Nance*, the witness must respond willingly to questions.

In *Nance*, the Court explained this by quoting from *United States v. Owens*, 484 U.S. 554, 561–562, 108 S.Ct. 838, 844, 98 L.Ed.2d 951 (1988), as follows:

> The Supreme Court added with respect to Fed.R.Evid. 801:
>
>> Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, *and responds willingly to questions.* Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists. . . .

331 Md. at 573, 629 A.2d 633 (emphasis added).

"[T]he greatest legal engine ever invented for the discovery of truth" (*California v. Green, supra*) cannot possibly operate if a witness refuses to answer questions. Because Eiland refused to answer all substantive questions, he was not available for cross-examination within the meaning of *Nance*.

Judge BLOOM authorizes me to state that he concurs with this dissent.

---

The criminal information charged that Eiland, between March 3, 1994 and March 21, 1994, "did willfully disobey a lawful order of the Honorable Judge Arthur M. Ahalt ..." in violation of the common law (contempt). Eiland pleaded guilty to the contempt charge on March 31, 1995. He was sentenced by the Honorable William Missouri to a two-year term of imprisonment, with all but twenty-two days suspended. One of the terms of his probation is that Eiland "testify truthfully as to a co-defendant previously tried, if there is a new trial."